## Carl T. BRITT

v.

John R. BLOCK, Secretary, U.S. Dept. of Agriculture; Bruce Watson, U.S. Dept. of Agriculture, S.C.S.; Robert Shaw, U.S. Dept. of Agriculture, S.C.S.; Richard Babcock, U.S. Dept. of Agriculture, S.C.S.

Civ. A. No. 82–279.

United States District Court, D. Vermont.

April 4, 1986.

Norman R. Blais, Blais Cain & Keller, Burlington, Vt., Walter G. Bilowz, Boston, Mass., for plaintiff.

George W.F. Cook, U.S. Atty., Donald J. Rendall, Asst. U.S. Atty., Rutland, Vt., for defendant John R. Block.

## FINDINGS OF FACT AND CONCLUSIONS

HOLDEN, Senior District Judge.

The plaintiff Carl T. Britt of Hinsdale, New Hampshire, commenced this action in his own behalf in the United States District Court for the District of Columbia to obtain equitable and monetary relief to redress his complaint of racial discrimination in his employment by the Soil Conservation Service of the United States Department of Agriculture. Federal jurisdiction has been invoked pursuant to Section 717 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16. The cause was later transferred to the District of Vermont.

An amended complaint was substituted in this court by plaintiff's present counsel of record. The plaintiff voluntarily dismissed the claims which he had earlier advanced against the defendants Watson, Shaw and Babcock. It appears that all of the conditions imposed by force of 42 U.S.C. §§ 2000e–16 and 2000e–5(f) have been met. The case proceeded to trial by the court sitting without a jury. Upon consideration of the evidence presented, the court states its findings of fact and the conclusions of law which follow.

### The Facts

Carl Britt is a black citizen of the United States who received a formal education in soil science at the North Carolina Agricultural and Technical College. He was graduated with a bachelor of science degree in soil science in 1971. On August 27, following graduation, he was appointed by the Department of Agriculture and assigned by that agency to the Soil Conservation Service (SCS) for initial employment in St. Albans, Vermont, at the grade level of GS–5, Soil Scientist. His first year's work was essentially performed in a training position which involved acreage counting and mapping the soil ingredients of the areas

under the investigation according to a grid system. In addition to soil mapping, he received training in soil evaluation, field survey, descriptive and manuscript writing and the conduct of field surveys.

The plaintiff's early years of service in the SCS were rewarding. In September of 1972 he was advanced to soil scientist in a higher grade. His supervisor, Robert Joslin, entrusted him with more responsibility, including work on manuscripts. As his training program continued he required less supervision.

Early in 1974 the plaintiff was designated for special assignment in Kentucky for the months of January through May. After eighteen months combined service in Kentucky and Vermont, Mr. Britt was advanced to GS–9 and assigned to serve in the supervisory capacity of soil survey party leader in Morrisville, Vermont under Bruce B. Watson, the State Soil Scientist. Before undertaking his new responsibilities, the plaintiff met with his supervisor, Watson to develop a training program and discuss his leadership requirements for the ensuing year. At this time there were five other soil party leaders in Vermont; all served in the GS–11 grade. Watson pointed out to the plaintiff that his recent assignment afforded an opportunity for experience and possible promotion. It was welcomed by Britt and had been recommended by his former supervisor Joslin; Mr. Watson concurred. At this meeting Watson indicated to Britt that he would have the same opportunities as others in the Service, but he would receive no special consideration because of his race. Britt agreed this was correct.

On February 10, 1975, a performance evaluation and within-grade increase rating was done.[1] The summary included the following narrative:

> Employee is making good progress in his first year as a soil survey leader. He carried out an effective initial soil survey review and put in considerable extra time preparing for it. Employee has taken two night courses during the past year at his own expense and time. Employee works well with co-workers and others and is well accepted. Employee is sincere and reliable. He is aware of his training needs and is striving to improve on his weaknesses.

Plaintiff's Exhibit 20, Defendants' Exhibit L (Form 434).

In keeping with the internal procedures of the Department and SCS, the evaluation was reviewed by Craig M. Ligett, a second supervising officer in the SCS. It was

1. The SCS used the following method to evaluate the job performance of employees: Performance Evaluation forms ("Form 434's") were filled out annually by each employee's supervisor, and discussed with the employee. Form 434's were used primarily for the purpose of determining within-grade salary increases. Proposed Pre-trial Conference Order ¶ 20a. In addition, Personnel Appraisals ("Form 504's) were completed for each employee. Plaintiff's Ex. 3, "Career Program Procedures," dated May 1, 1972, page 7, states: "SCS uses the multiple appraisal system to evaluate an employee's performance, ability and potential. Each employee is appraised by his immediate supervisor and normally two other employees of higher grade who know his abilities, performance and potential." The document also states, at page 8, that the Form 504 "is to be used for obtaining individual appraisals. New performance appraisals are to be obtained on full-time career and career-conditional employees once a year in accordance with the following schedule: one year after the date of assignment to *present* position and once each year thereafter." Each appraiser evaluated an employee on the Form 504 by assigning marks of "strong," "above average," "average," "below average," or "weak" for each of 16 performance categories, and by providing written comments. The substance of each completed Form 504 was then transferred to an Appraisal Summary ("Form 505"). Plaintiff's Ex. 2, "Career Program," dated December 7, 1971, page 11, states: "An employee's appraisal summary is developed from individual appraisals (SCS–PERS–504's) together with information concerning the employee's education, training, experience, and awards." The Form 505 contained all the marks from each individual appraisal recorded in Form 504, as well as a summary of the written comments on each Form 504. Plaintiff's Ex. 3, *supra.* SCS used each employee's most recent Form 505 in selecting candidates for competitive promotions. Plaintiff's Ex. 1, "Career Program Procedures," dated October 14, 1971, page 3, states: "Appraisal summaries describing employees' performance in their present positions are used to determine if they are eligible, highly qualified, or among the best qualified for the promotion."

certified by the plaintiff as an accurate statement of his duties and responsibilities. This assessment of the plaintiff's performance in line of his assignment marks the high point of the several evaluations received in evidence during the trial. During this period of time when the plaintiff served as a soil survey party leader, he supervised another federal employee, two state soil scientists and others assigned to work under his direction in the CETA program.

Early in August a field review was conducted by a team headed by David L. Yost, the Assistant State Soil Scientist under Watson. Yost reported to State Conservationist Craig M. Right on the work done by the soil survey party under Britt's leadership. The report explains—"Since the party leader has been in Lamoille County a relatively short time the descriptive legend is not complete, but adequate time and data should be available for completion during F.Y. 1976." It is further indicated that "the soil survey party is doing a commendable job." Yost's report, however, was critical of certain aspects of the plaintiff's performance.

Field notes were reviewed during the progress field review for classification and correlation purposes. Most field notes were incomplete and were not useable. Field notes must contain the necessary data pertinent to each series to aid in classification and correlation. Field notes for many mapping units were too few in number.

(Progress Field Review, Lamoille County, Vt., August 11–14, 1975. Def.Ex.II.) The soil survey report included other deficiencies which Britt, as party leader, had the responsibility for, and agreed to correct by certain specified deadlines.

In January 1976 the position of soil survey party leader for Lamoille County was elevated from GS–9 to GS–11 level. The number of members composing the survey team was increased. The plaintiff promptly applied for the reclassified position.

A performance evaluation, on Form 434, was completed by the plaintiff's supervisor, Bruce Watson, on March 1, 1976.[2] It was also reviewed by Craig Ligett. The plaintiff certified on March 9 that his supervisor had discussed the appraisal and rating with him; the position description and employee's responsibilities were accurately stated.

This evaluation was followed by an appraisal summary, prepared on Form 505 dated March 4, 1976. Of the sixteen evaluation factors Britt was rated average or above on all rating points. One of his evaluators scored him below average in communication in writing. His potential at that time was marked at GS–11 by one of his supervisors, with the capability of party leader within two years. His potential at that time was marked by the other appraisers at GS–9 with GS–11 capability in two years.[3]

The plaintiff did not object to the rating. However, he complained to Watson that he felt the narrative summary shown in the margin was unfair and the appraisal was

---

**2.** The Performance Evaluation ("Form 434"), dated March 1, 1976, which evaluated Britt's performance as Soil Scientist, GS–9, stated:

Employee has demonstrated a proficient quantity of work considering that he has been responsible for two state employees during part of the 1975 field season. Quality of field mapping and other phases are passable for the most part. Deficiencies in delineating cultural features and some soil boundaries have been noted in field reviews. This phase must be improved to achieve a proficient or higher rating. The classification of some mapped areas has been inaccurate and new units should have been recognized and proposed for some units. Employee has potential for positions of greater responsibility after he acquires additional proficiency in soil surveys, especially in the classification and mapping of soils and in correlation. Employee has shown above average initiative in pursuing additional knowledge through the University of Vermont and the USDA graduate school. He has carried out a good information program in Lamoille County and works well with local people.

Plaintiff's Ex. 21/Defendant's Ex. M.

**3.** Plaintiff's Ex. 13/Defendant's Ex. N, Appraisal Summary ("Form 505") for Carl Britt, March 4, 1976.

untimely since it was prior to the anniversary date of his last promotion.

At the time the soil survey party leadership for Lamoille County was advanced to Grade 11, the SCS solicited candidates from within and outside Vermont. Richard Babcock, an employee with SCS who was serving as soil survey party leader at GS–11 grade in Maine, was selected and transferred to fill the position in Lamoille County in April or early in May 1976.

Shortly thereafter John Pratt, who was employed with SCS in Franklin County as a Soil Scientist, GS–7, was assigned to Babcock's team along with the plaintiff and Dennis Flynn, at GS–7. This assignment was in keeping with the policy of SCS which required the team leader Babcock to be at a higher grade than the members serving under him.

The plaintiff did not challenge Babcock's selection. However, Britt regarded the fact that he was not appointed to the upgraded position as a demotion since his performance as party leader was satisfactory and the selection of Babcock was not the result of any fault or shortage on the plaintiff's part. The court finds that the selection of Babcock over the plaintiff did not constitute a demotion for Britt within the sense of administrative procedures of the Department of Agriculture applicable at that time to the Soil Conservation Service.[4]

The plaintiff's immediate supervisor did not regard the personnel change nor Britt's transfer from Morrisville to Hyde Park in Lamoille to be a reduction in rank. Watson regarded Britt's assignment at Grade 9 to be a real opportunity for him to obtain different supervision under an experienced leader which would aid in the correction of deficiencies that developed during the time of his service as a party leader.

The party leader had the responsibility for work assignments to the members of his survey team. In this function Babcock considered all work assignments to be comparable in terms of difficulty of performance. The plaintiff was provided a written statement of his principal duties and the quality performance requirement relative to the duties listed. These submissions were signed by the plaintiff and Babcock on November 1, 1976, May 6, 1977 and January 31, 1978.

Babcock testified that every member of his survey team participated in all functions. The plaintiff, however, developed a sensitivity about Babcock's work assignments contending that he was given more menial tasks, such as auguring and digging for soil samples, that would not advance promotion. The court finds that discrete assignments were made by Babcock according to the particular competence of the individual team members without racial preference or bias.

The plaintiff was assigned work consistent with that specified in the written statement of his prescribed duties and performance requirements. In the area of manuscript writing, the main effort was performed by Babcock with the geology section assigned to Pratt. The illustrative work was performed by Flynn. The plaintiff was not called upon to contribute to manuscript writing. The evidence, both written and oral, leads the court to conclude that the plaintiff's exclusion from this aspect of the survey team's work was due to the considerable difficulty Britt experienced in grammar and spelling in written communication. The evidence refutes the contention that their differentials in work assignments derived from preference for white team members. Rather, it appears from the record that the variance in the detailing of tasks for a particular project was based on past performance, experience and training in the work to be done.[5]

**4.** Plaintiff's Ex. 3, "Career Program Procedures," dated May 1, 1972.

**5.** John Pratt had pursued post graduate work in geology. Dennis Flynn was considered artistic and was assigned block work. On the other hand, the plaintiff had writing difficulty with grammar and spelling. This subject of writing was included in his training program. Plaintiff was given authority to take a special writing

The work of the soil survey team at the time Richard Babcock was its leader, in April 1976 and thereafter, was seasonal. The "field season" was the time when work was done during the period from late spring through early fall. When outdoor work was foreclosed, during the remainder of the twelve months, the period was designated as "non-field season." In the field season the team was principally engaged in performing the details of a field survey by mapping the county, procuring soil samples within specific boundaries, preparing field notes and profile descriptions of the terrain studied.

Each soil scientist in the team was given an area of responsibility. The members of the team were assigned goals according to the time estimated for that particular worker to map the area being studied and the estimated time in which he could accomplish that objective.

The plaintiff questioned Babcock why he had been heavily assigned to do so much acreage counting, while other members of the team were assigned more demanding responsibilities. The record does not sustain the plaintiff's contention that he was singled out for this function. The undisputed evidence presented at trial, including Mr. Britt's testimony, is that all members of the party were engaged in this work.

It further appears from the documentary evidence presented by both sides of this controversy that during the first six months of 1976 the plaintiff was much involved in correcting and supplementing the field survey review conducted by David L. Yost, the Assistant State Soil Scientist referred to earlier. The plaintiff's supervisors directed him to correct deficiencies in profile descriptions and complete mapping reviews noted in the 1975 field survey. The record indicates that this effort occupied the attention of the plaintiff and his supervisors in this time period.[6]

During the ensuing year the plaintiff's mapping work improved. On May 2, 1977, David Yost wrote the plaintiff, with copies to Watson and Babcock:

> This memo is to let you know I appreciate your effort in completing the Castleton Watershed. The acreage mapped was more than expected and your field notes and description were of assistance in the classification and correlation of units that needed attention.[7]

Sometime during the 1977 field season, in the course of a counseling session, the plaintiff informed Robert Shaw, the State Conservationist, that he was experiencing problems with his party leader, Richard Babcock. Mr. Britt voiced the complaint that he had initialed one of the maps prepared in connection with a soil profile de-

course in 1978 but he did not avail himself of the opportunity.

**6.** Several communications exchanged between Britt and his supervisors in 1976 refer to deficiencies in Britt's work. In a letter dated May 10, 1976, from Bruce Watson to Britt, Watson noted that Britt had failed to complete field profile descriptions for 14 soil series to which Britt had been assigned, and had completed descriptions for only 5 soil series, despite what Watson viewed as sufficient time to complete the assignment. The letter also indicated that the amount of Britt's progress on the "descriptive legend" was "unacceptable." Watson requested a response from Britt. Defendant's Ex. KK. Britt responded in a letter dated May 24, 1976, in which Britt explained that he had not completed the assignment due to the fact that he had devoted time to other tasks, due to a delay in receiving materials, and also because Britt apparently believed that certain soils did not have to be included in the descriptive legend.

Defendant's Ex. MM. Watson wrote back to Britt on June 8, 1976, indicating that in his view Britt should have been able to complete the assignment notwithstanding the reasons offered by Britt for the delay. Defendant's Ex. MM. Similarly, a letter from David Yost to Richard Babcock, dated September 29, 1976, outlined errors in field descriptions prepared by Britt in September, 1976 and indicated that improvement was needed. Defendant's Ex. OO.

In addition, several letters described deficiencies in mapping prepared by Britt. For example, a letter from Babcock to Watson, dated June 16, 1976, reported on several errors found in soil mapping prepared by Britt, and indicated necessary corrections. Defendant's Ex. NN. A letter from Babcock to Watson dated August 2, 1976 indicated a number of errors in mapping prepared by Britt. Defendant's Ex. QQ.

**7.** Plaintiff's Ex. 30, Letter from David Yost to Carl Britt, dated May 2, 1977.

scription. According to Mr. Britt's testimony, his initials were erased and Babcock's initials were substituted on the map. The purpose of the alteration was not explained. During the course of this meeting, the plaintiff informed Shaw that other members of the soil survey team were assigned more technically sophisticated work and this impaired his chances for promotion.

On February 20, 1978 the Soil Conservation Service, by R.T. Dunton, the Administrative Officer for Vermont, issued a formal announcement of a vacancy at Rutland for a soil scientist in a supervisory capacity at GS–11 level. The text of the announcement stated the vacancy would be filled under the Merit Promotion Program; March 31, 1978 was the announced closing date. The level of consideration was for those holding positions at GS–9. The announcement specified the following descriptions and requirements:

*Position*

The incumbent will serve as party leader for the soil survey in Rutland County. In this position he will supervise and train 2 to 3 lower grade soil scientists. The other major responsibilities will be: (1) characterization, classification and mapping of the soils within a complex, glaciated area in northern Vermont; (2) preparation of the soil handbook and manuscript for his assigned county; (3) interpretation of soil surveys; and (4) technical assistance to the District Conservationist in on-site reviews and working with governmental units and farmers. Several major ski areas have resulted in residential and commercial development in a formerly rural environment. This development has increased the need for accurate soil surveys and acceleration of mapping.

*Basic Eligibility Requirements*

Candidate must meet the basic qualification requirements for a Soil Scientist GS–11 position. All qualified candidates also will be evaluated against the following criteria:

1. Communicating orally and in writing.
2. Accepting responsibility and initiating action.
3. Evaluating facts and making decisions.
4. Planning and organization of work.
5. Leadership and supervisory ability or potential.
6. Ability to work effectively with people outside SCS.

Candidates will be considered for lateral assignment as well as promotion.

Employees who wish to be considered must apply in writing to the State Administrative Officer. A short, concise letter expressing your interest in being considered will be satisfactory.

Supervisors must notify qualified employees who are in leave status so their names may be submitted if they wish to be considered.

*Equal Employment Opportunity*

Candidates will be considered without discrimination for any non-merit reasons such as race, color, religion, sex, national origin, politics, marital status, physical handicap, age, membership in an employee organization.

Plaintiff's Exhibit 10.

The position vacancy at Rutland was included in projected plans of the SCS which originated early in the 1970's. It was apparently known by supervisory employees that the opportunity for soil survey party leadership at GS–11 would be effected in the future; at least Babcock acknowledged this awareness, but disclaimed information about the timing. Watson knew the party leader post was in the offing when he signed the plaintiff's appraisal on November 14, 1977.[8] This witness squarely denied any knowledge concerning the identity of probable candidates and had no knowledge that Britt was interested.[9]

---

**8.** Testimony of Bruce Watson concerning Plaintiff's Ex. 15/Defendant's Ex. S, Appraisal Summary ("Form 505") for Carl Britt, dated January 17, 1978.

**9.** *Id.*

The plaintiff testified he believed the appraisal in 1977 was initiated by his supervisor Babcock, with actual knowledge that the leadership position at Rutland would soon open up, but the opportunity was left unannounced until February 1978. He attributes prejudicial motives on the part of his SCS supervisor to call for an out-of-time appraisal which would be unfavorable to his prospects for appointment. He urges that the earlier 1977 appraisal done in April should have been the basis for the consideration of his candidacy. The plaintiff candidly conceded that this aspect of his claim of bias and preference is not supported by any probative evidence; rather, it was his personal impression.

Ms. Karen Davignon, of the SCS personnel office in Burlington, testified that it was her responsibility to initiate the timing of the entire appraisal process. She transmitted evaluation forms (434) to the employee's supervisor as soon as these documents were received from the National Finance Center. At the same time the evaluation performance forms were transmitted to the employee's supervisor, the appraisal was commenced by Ms. Davignon's transmittal of additional forms (504) to the four appraisers designated to appraise the plaintiff's performance for the period under investigation.

The transmission of the forms for Mr. Britt's performance evaluations, completed on Form 434 in 1978, was out of time in reference to prior evaluations. The sequence of these personnel records is shown to be:

For rating period 5/11/75 to 5/9/76 certification by supervisor dated 3/1/76;

For rating period 4/11/76 to 4/10/77 certification by supervisor dated 1/25/77;

For rating period 1/25/77 to 1/29/78 certification by supervisor dated 1/25/78.

Plaintiff's Exhibits 21, 22 & 23.

The appraisal summaries (Form (505) for the corresponding years were in keeping with the timing of the performance evaluation records in the year 1976 (Pltfs. Ex. 13) dated March 4, 1976 and 1977 dated April 5, 1977 (Pltfs. Ex. 14). The first appraisal summary in 1978, dated January 17, 1978, was based on personnel appraisals by Yost, Watson and Babcock that were completed the preceding November.[10] This appraisal was early in terms of synchronization with prior years.

The parties are agreed that the SCS procedures prescribed that appraisals be performed on the anniversary of the employees' last assignment. The plaintiff's last assignment began March 11, 1976.

The court finds from the facts derived from the exhibits received at the trial that the appraisal undertaken in November 1977 was out-of-time in relation to the prior appraisal of the plaintiff in 1976 and 1977. That is not to say the out-of-time appraisal was prejudicial in terms of the factors considered. The first appraisal in 1977, which the plaintiff contends should have been used as the basis for his promotion, was less favorable than the later appraisal reported on January 17, 1978.

The plaintiff received a copy of the Appraisal Summary dated January 17, 1978. This writing set forth the ratings made by each of the appraisers in the sixteen factors listed on the printed form.[11]

The plaintiff requested a reappraisal on February 6, 1978, stating that his most recent appraisal did not reflect the quality of his performance during the preceding year. The second appraisal was completed by the same three supervisors who completed the January evaluation. The second review did not change Watson's first appraisal. Babcock increased the prior rating in one evaluation. Yost reduced nine of his

---

**10.** The fourth appraiser designated to evaluate the plaintiff, John C. Titchner, wrote that he was not sufficiently familiar with the employee's work to give a fair appraisal. Plaintiff's Ex. 15/Defendant's Ex. S, *supra.*

**11.** Plaintiff's Ex. 15/Defendant's Ex. S, Apprais-

prior ratings.[12] However, neither his oral testimony nor the documentary evidence lends support to the plaintiff's suspicion that Yost's second appraisal was in retaliation for Britt's request to be reappraised.

Before the second appraisal was completed, the Rutland vacancy was formally announced as shown in the margin above. The plaintiff became a candidate. He was the only black among the six who joined in competition for the position. These included John Pratt, who, as noted above, served with the plaintiff on the soil survey party team that was headed by Richard Babcock.

The Soil Conservation Service Career Program Procedures prescribed the means and method of evaluation of the candidates. The qualification standards prescribed by the United States Civil Service Commission are used as the basis for minimum criteria. One of the principal sources of evaluation of candidates is the appraisal summaries that describe "the employees' performance in their present position ... to determine if they are eligible, highly qualified or among the best qualified for promotion." [13]

It is not questioned that all of the candidates met the basic requirements for the position, although the application of the rules and regulations of the Civil Service Commission are in conflict. Yet the testimony of the applicants, and those who appraised them, make it appear that this reference source was not consulted. All are agreed that experience was important to the selection process. Neither Pratt nor Britt had achieved doctoral degree status. Britt had the benefit of twenty months as party leader, GS-9. Pratt had served as party leader only briefly in Babcock's absence.

Eligibility for advancement to Soil Scientist, GS-11 level, as specified in the Civil Service rules submitted to the court (Pltf. Ex. 43), required a candidate to have a bachelor's degree in soil science or related fields of study. In addition to the basic requirement, completion of additional education for a doctoral degree or equivalent in appropriate soil science fields is noted for GS-11. A combination of education and experience was permissible. In the combination of education and experience to achieve the basic requirements, 30 semester hours were regarded as the equivalent of 9 months experience. The evidence indicates that both Pratt and the plaintiff fulfilled the basic requirements. There is no proof that either candidate qualified for the additional requirement of a doctoral degree as equivalent experience.

John Pratt was hired by the State Soil Scientist Bruce Watson to perform soil mapping in Franklin County in the grade of GS-5 in 1974. A year later he was advanced to GS-7 level. Pratt had become acquainted with Bruce Watson while serving in the Vermont National Guard reserve component.

Roger Dunton,[14] the SCS Administrative Officer in Vermont at the time, was charged with the function of considering the relative strength of the candidates, evaluating their competency, qualifications and making recommendations for the position. Those candidates who achieved the highest scores were listed as "best qualified" for selection by Robert Shaw, the State Conservationist.

Carl Britt's appraisal summary prior to the selection was dated March 22, 1978, and is shown in the margin.[15] John Pratt's last appraisal, before selection was made, was completed May 3, 1977.[16]

al Summary ("Form 505") for Carl Britt, January 17, 1978.

**12.** Plaintiff's Ex. 17/Defendant's Ex. V, Appraisal Summary for Carl Britt ("Form 505"), dated March 22, 1978.

**13.** Plaintiff's Ex. 3, *supra,* at 4.

**14.** Mr. Dunton retired in August, 1982 and has resided in Florida for the past several years.

**15.** Plaintiff's Ex. 17/Defendant's Ex. V, Appraisal Summary ("Form 505") for Carl Britt, 3/22/78.

**16.** Plaintiff's Ex. 34/Defendant's Ex. EE, Appraisal Summary ("Form 505") for John Pratt, May 3, 1977. The identity of the three appraisers does not appear on the Appraisal Summary.

In determining the ratings of the respective candidates, the most recent appraisal summary was used to determine the numerical ratings that were recorded. The aggregate of the ratings was divided by total marks received to obtain the ratings of each candidate. Scoring the candidates in inverse numerical order, the candidate receiving the lowest numerical score was rated the best qualified. This method ranked John Pratt second in the mathematical ratings. The plaintiff was scored in the sixth position.[17]

Despite the shortage in the consideration of the plaintiff's past experience as a party leader in Lamoille County in 1976–77, referred to above, the evidence presented concerning the selection process and the qualifications of the candidates that underlie the evaluation ratings, sustains in full measure the final choice. The selection by the State Soil Conservationist Shaw was in keeping with the educational background, work performance and leadership qualities of the respective candidates that were assessed on the basis of the essential rating factors prescribed on the face sheet of the appraisal form (505). The evidence indicates that the plaintiff and Pratt received the same rating on only one evaluation factor (dealing with persons or groups outside SCS).[18]

The State Administrative Officer Dunton notified the plaintiff on April 19, 1978, that John Pratt was selected for the position of Supervisor, Soil Scientist at Rutland. After learning that he had not been selected, the plaintiff informally expressed his disappointment by writing Mr. Dunton. His grievance was pursued by other discussions and meetings with his supervisors to no avail.

The plaintiff then proceeded to file a written complaint of discrimination. Robert Shaw, State Conservationist, was named as the person the complainant believed to have discriminated against him. In the reason for the complaint, it was stated that Bruce Watson, State Soil Scientist, was also included as having discriminated against the complainant because of his race. The complainant requested corrective action to afford him: "Equal position to that in which I was discriminated against—GS–11 Soil Scientist—Soil Survey Project Leader."

The complaint against Shaw and Watson specified April 19, 1978 as the date of the most recent alleged discrimination. A second unrelated complaint that alleged discrimination of March 22, 1978, was filed on the same day against Richard Babcock. The initial complaint specified discrimination in promotion; the Babcock complaint explained the discrimination on the basis of adverse appraisals. Both charges advanced reasons which included unfair consideration for promotion, unfairness in performance ratings, work assignments and denial of job opportunities that were essential to career advancement. The complaints were investigated by the Department of Agriculture. After an evidentiary hearing at Brattleboro, Vermont, the administrative proceedings resulted in a determination on March 23, 1982, of no discrimination by those accused by the complainant.

During the pendency of the EEOC complaint, the plaintiff was promoted on October 4, 1981, to the position of Soil Survey Party Leader for Bennington at GS–11. Mr. Britt has continued in this office to the present time.

## Discussion
### Destruction of Records

■ At the threshold of consideration of the merits of this controversy, the court is confronted with the charge by the plaintiff that SCS representatives engaged in bad faith destruction of pertinent documents. Evidence on this point was presented by two witnesses called by the defendant.

17. Plaintiff's Ex. 41/Defendant's Ex. GG, "Evaluation of Candidates for Promotion," undated.

18. Plaintiff's Ex. 15/Defendant's Ex. S, *supra;* Plaintiff's Ex. 17/Defendant's Ex. V, *supra;* Plaintiff's Ex. 34/Defendant's Ex. EE, *supra.*

This contention has been strenuously pursued by the plaintiff throughout the extensive discovery process. The claim has been opposed with equal vigor by the Secretary in pretrial hearings conducted and reported by the United States Magistrate and the court as well. The court will not repeat the considerations and rulings written in denying the plaintiff's motion to impose the extreme sanction of default for willful destruction of documents requested by the plaintiff. (Civil Action No. 82–279, Opinion filed October 16, 1985.) This aspect of the controversy was revised and revisited at the trial.

The plaintiff's complaint centers on destruction of personnel and work records of various white employees that the plaintiff sought to use as a basis of comparison to support the contention that racial discrimination was a factor in the plaintiff's delayed advancement, particularly in his being passed over for the Rutland vacancy. To refute this untoward inference, the defendant summoned two SCS employees concerned with the responsibility of preservation and destruction of related records.

After the plaintiff's EEO complaint was initiated, and the extensive investigation undertaken by the general counsel's office of the Department, the plaintiff's personnel records were preserved. However, the retention did not include all of such records of other persons in SCS that might shed some light on the racial preference issue. The defendants' witness, Karen Davignon, testified that the disposition made of the documents sought by the plaintiff was dictated by guidelines established by the SCS. The policy practice and rules of the agency directed that employees' performance evaluations and appraisals be routinely destroyed three years after the date the supervisory officials had prepared and filed them. In keeping with this practice, the personnel records of other employees for the years 1978 and before were destroyed by 1981. Apparently John Pratt's appraisal summaries for 1977 and 1978 and his standard of performance dated October 28, 1976, were preserved since his promotion was implicated in the EEO complaint.

(Pltf's Ex. 34, 35, 36). In any event, the court finds that the witness Davignon was not advised of the relevancy or expediency for retaining the records of other employees. She was neither advised nor directed by any employee of the SCS to retain or destroy the documents in question. Her acts in this regard were performed in good faith. The destruction was prompted entirely by her understanding of the applicable agency directives.

A further shortage claimed by the plaintiff concerned the working papers, including field notes, daily diary sheets and time attendance records prepared by soil scientists in the performance of their assigned duties in Vermont. Ms. Ferrier served in the accounting section of the SCS during the time under investigation. The daily records were submitted and retained as financial documentation of a variety of related expenses and disbursements at the Winooski office of SCS. She was not aware of the plaintiff's EEO complaint. She disposed of the field notes and time record sheets pursuant to her understanding of the agency rules. In this function she received no instructions from her supervisors concerning the preservation or destruction of the records of which the plaintiff complains. In consequence, those documents were preserved for a three year period and then routinely destroyed.

The plaintiff urges that failure of the defendant to call other witnesses who had higher responsibility for record maintenance creates an adverse inference that the destruction of the records was wrongful.

The record does not bear this out. Numerous witnesses of higher rank in the SCS were available and cross examined by counsel. The list includes John Titchner, the present State Conservationist who served as assistant to Robert P. Shaw, his predecessor in office at the time the Rutland selection was made. As noted earlier, Dunton resides in Florida after retiring in 1982.

■ To be sure, the destruction of personnel and daily work records might arouse

suspicion. However, in the context of the evidence at hand, it does not prove bad faith on the part of those responsible for the agency records. Destruction of records through misunderstanding or negligence is not sufficient to supply evidence or recast the burden of proof. *See Coates v. Johnson & Johnson,* 756 F.2d 524, 551 (7th Cir.1985); *Valentino v. U.S. Postal Service,* 674 F.2d 56, 73 n. 31 (D.C.Cir. 1975).

*Title VII Claims*

Other events and circumstances developed in the plaintiff's career following his promotion to GS–9 and assignment to serve as party leader for Lamoille County in the summer of 1974 that caused Mr. Britt to become suspicious that his career advancement was beset by the preference of his supervisors for other soil scientists. Appraisals were initiated in some instances shortly before opportunities for advancement became available when the soil survey party leadership at GS–11 was opened up and candidates were recruited from outside Vermont. The plaintiff presses the contention that he was disfavored in assignments by his supervisors to perform routine tasks that kept him from demonstrating his true capabilities. The new party leader Babcock failed to develop and supervise a training program for his predecessor in this position. Although the plaintiff was senior to Pratt in point of service at Grade 9 level and had served as party leader, Pratt was selected by Babcock to act in this capacity in Babcock's temporary absences.

The combination of circumstances and events shown at the conclusion of the plaintiff's direct case gave rise to various conflicting inferences that Mr. Britt's career advancement could have been frustrated by reason of his race.

Giving the plaintiff the full benefit of these facts and circumstances at the conclusion of the plaintiff's testimony, it must be said, in the light of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct.

1817, 1824, 36 L.Ed.2d 668 (1973), that a prima facie case had been presented.

Mr. Britt belonged to a racial minority. He sought the promotion which was announced by his employer. At least one of his supervisors had reported that Mr. Britt had the potential for advancement to GS–11 level. He was not selected.

As the defendants' proof unfolded, sound objective reasons were presented to justify the selection of the defendants' competitor on the merits. The defendants' evidence was entirely sufficient to dispel the facial presumption of unlawful preference. The evidence which followed failed to demonstrate that the defendants' choice was based on pretext, rather than merit. *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802–803, 93 S.Ct. at 1824.

The full trial of this action centered on the merits of the crucial question: Did the responsible officers in the Soil Conservation Service within the Department of Agriculture intentionally discriminate against the plaintiff because he is a black person? *U.S. Postal Service v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1980); *Richardson v. Hotel Corp. of America,* 332 F.Supp. 519, 521 (E.D.La.1971) (Rubin, J.), aff'd 468 F.2d 951 (5th Cir.1972).

■ Title VII does not prohibit preference in promotion. It forbids preference that is racially motivated. Cf. *Krulik v. Board of Education,* 781 F.2d 15, 21 (2d Cir.1986); *Capers v. Long Island R.R.,* 429 F.Supp. 1359, 1365 (S.D.N.Y.1365) aff'd 573 F.2d 1291 (2d Cir.1977).

■ The final selection of John Pratt for promotion to the responsibilities of soil party leader at Rutland, in June 1978, is justified by the respective records of all the applicants. The performance and career appraisals of the plaintiff demonstrate that he had the highly regarded capacity for getting on well with fellow workers, as well as with others outside the SCS. The overall ratings of the other candidates,

Pratt, Nelson, Kimble and Hersey, had equivalent or higher ratings in this and all other components of the selection process. (Pltf's Exhibits 34, 38 through 41).

The plaintiff strongly contends that the experience he gained in the position of soil survey party leadership in Lamoille County was ignored. However, his performance in this capacity was not entirely favorable, particularly at the time the Lamoille and Rutland vacancies became available. The extensive personnel records for the years 1975 through 1978 speak in unison that the plaintiff had a future capacity for greater responsibility that had not sufficiently matured to justify his selection over the other candidates who sought the soil survey party leadership for Rutland County in the spring of 1978. This is corroborated by the Program Field Review conducted by the Assistant Soil Scientist Yost in Lamoille County during the time Mr. Britt served as party leader in August 1975.

The extensive evidence bears no convincing proof that the plaintiff's race was a factor in the choice of the successful candidate Pratt over the plaintiff. To the contrary, the plaintiff's qualifications did not measure up to the ratings given to the three best qualified candidates. His standing was the lowest in the scoring in comparison to all of the applicants considered.

Viewing all the evidence within the framework and prescription of *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 792, 93 S.Ct. at 1817, the defendants have shown that the promotion of Pratt over the plaintiff was based on merit. The record is clear that the plaintiff, and the unsuccessful white candidates as well, were treated alike. Race was not a factor in the final choice.

From all the documents exhibited to the court and the total evidence elicited from the witnesses, the court is persuaded that delay in the plaintiff's promotion to a leadership position as a soil scientist, GS–11, was not caused by unlawful discrimination. The employer's decision was based on the relative ratings achieved by the several aspirants at the time the selection was made.

Since the plaintiff is not entitled to prevail, the clerk is directed to enter an order dismissing the action without costs to either party.

SO ORDERED.