James and Yolanda RODRIGUEZ, Plaintiffs–Appellees and Cross–Appellants,

v.

John W. SCHUTT, Defendant–Appellant and Cross–Appellee.

No. 93CA1194.

Colorado Court of Appeals, Div. V.

Dec. 15, 1994.

As Modified on Denial of Rehearing Jan. 26, 1995.

Certiorari Granted May 22, 1995.

Charles Welton, P.C., Charles Welton, Philip A. Klein, Denver, for plaintiffs-appellees and cross-appellants.

Harris, Karstaedt, Jamison & Powers, Arthur R. Karstaedt, III, A. Peter Gregory, Englewood, for defendant-appellant and cross-appellee.

Hall & Evans, L.L.C., Alan Epstein, Denver, for defendant-appellant and cross-appellee (On the Briefs).

Opinion by Judge TAUBMAN.

In this negligence action to recover damages for personal injuries, defendant, John W. Schutt (landlord), appeals the judgment entered on a jury verdict in favor of plaintiffs, James (husband) and Yolanda (wife) Rodriguez (collectively tenants). Plaintiffs cross-appeal regarding the calculation of in-

terest on the judgment. We affirm but remand for recalculation of interest.

Husband sustained an injury to his hand and wrist from broken glass on a storm door to tenants' apartment. Tenants had rented the apartment from landlord who owned the building. They claimed that the glass in the storm door was cracked and that a slider had been "jerry-rigged" into it in place of a stationary piece of glass. Upon returning home one evening, husband, who had forgotten his keys, knocked on the door to get his wife's attention. As a result, the slider broke, the window shattered, and the pieces came down on the husband's hand and wrist causing an injury. Subsequently, tenants brought this action against landlord, husband seeking damages for his injuries and wife claiming loss of consortium.

At trial, tenants testified that they retained the original slider but later lost it during the move from the apartment to their subsequent residence. However, they had taken photographs of the slider approximately two months after the injury occurred, and those photographs were admitted into evidence at trial.

In addition, landlord's apartment manager testified at trial that she had observed the slider prior to the injury and noticed that it was in very poor condition and that the photographs accurately depicted the slider. She further testified that at sometime prior to the accident, while talking to landlord in front of tenants' apartment, the top glass window on the screen door fell down, and she observed that the pins to the slider were bent in such a way so that they did not properly support the window.

Tenants further testified that when they moved into the apartment they walked through it with landlord and pointed out to him several things that needed to be repaired and that he agreed to make such repairs. Tenants claimed that they had given a written list of those items to landlord. They testified that they had retained a copy of the list, which they recalled giving to their attorney for use in this case. However, their attorney asserted during a deposition that he had no recollection of ever having received a copy of the list. Consequently, neither ten-

ants nor landlord produced a copy of the list at trial. Tenants, however, were permitted to testify at trial regarding the contents of the lost list.

The jury entered a verdict on behalf of husband for $275,000 and wife for $25,000. However, the jury found husband 30 percent contributorily negligent, and accordingly, the trial court reduced the awards and entered judgment in favor of husband for $192,500 and wife for $17,500. Then, upon plaintiffs' motion, the trial court calculated interest on the judgment at 9 percent per annum from the date of the injury, and this appeal followed.

Landlord argues that, since tenants failed to produce the slider and the list, the trial court should have imposed a sanction against them in order to reduce the evidentiary imbalance created by the loss or destruction of those items. Conversely, if the judgment is affirmed, landlord seeks a $5,000 offset from the judgment for a payment made by his insurer to husband prior to trial. Tenants, on cross-appeal, challenge the operation of § 13–21–101, C.R.S. (1987 Repl.Vol. 6A) on both statutory and constitutional grounds.

I. Appropriateness of Sanctions for the Spoliation of Evidence

Landlord contends that the trial court erred by not excluding from evidence any reference to the lost list or slider as a sanction for their not being produced at trial. Alternatively, he contends that the trial court should have tendered to the jury his proposed instruction directing it to infer that had the list or slider been introduced at trial it would have been adverse to tenants' case. We perceive no error.

Relying on *People v. District Court*, 200 Colo. 65, 612 P.2d 87 (1980), and *Estate of Holmes*, 98 Colo. 360, 56 P.2d 1333 (1936), landlord asserts that where evidence is lost or destroyed, it is incumbent on the trial court to levy an appropriate sanction, either by excluding any reference to the lost or destroyed evidence or by affording the party deprived of the evidence an "adverse inference" jury instruction. However, those cases are distinguishable because both addressed

the situation where evidence had been intentionally destroyed. In this case, however, there was no indication that tenants had intentionally lost or destroyed either the slider or the list.

Landlord admits that Colorado courts have entered sanctions against a party with lost or destroyed evidence only where the evidence had been intentionally destroyed, but have not addressed the situation where, as here, the evidence was not willfully destroyed. Because of this absence of Colorado precedent, we look to other jurisdictions to determine whether a sanction is warranted against a party who loses evidence before trial.

In general, most courts addressing the issue have held that an adverse inference may be drawn only when it has been demonstrated that the destruction of evidence was intentional. *See Hirsch v. General Motors Corp.,* 266 N.J.Super. 222, 628 A.2d 1108 (1993) (holding that, as a prerequisite to drawing an adverse inference instruction, there must be a showing that the destruction of evidence was intentional); *Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68 (S.D.N.Y.1991); *Britt v. Block,* 636 F.Supp. 596 (D.Vt.1986); *but see Glover v. BIC Corp.,* 6 F.3d 1318 (9th Cir.1993).

■ In *Turner v. Hudson Transit Lines, Inc., supra,* the court explained that the concept of providing an adverse inference instruction as a sanction for spoliation is based on two rationales. The first is punitive. Allowing the trier of fact to draw an adverse inference presumably deters the parties from destroying evidence to prevent its introduction at trial. The other rationale is remedial, to restore the putative prejudiced party to the same position with respect to its ability to prove its case that it would have held had there been no spoliation. Further, the trial court has broad discretion as to whether to permit the jury to draw an adverse inference from the loss or destruction of evidence. *Glover v. BIC Corp., supra.*

■ The state of mind of the party that destroys evidence is an important consideration when determining whether an adverse inference is the appropriate sanction. Where a party intentionally destroys evidence to prevent its introduction at trial, the trial court clearly has the power to employ an adverse inference as a sanction. *Turner v. Hudson Transit Lines, Inc., supra.*

■ In addition, such an inference may be appropriate even in the absence of a showing of bad faith in order to remedy the evidentiary imbalance created by the loss or destruction of evidence.

However, where the destruction was negligent rather than willful, special caution must be exercised to ensure that the inference is commensurate with information that was reasonably likely to have been contained in the destroyed evidence. Where ... there is no extrinsic evidence whatever tending to show that the destroyed evidence would have been unfavorable to the spoliator, no adverse inference is appropriate.

*Turner v. Hudson Transit Lines, Inc., supra,* at 77.

■ Additionally, CRE 1004(1) provides that the original of a written document is not required, and other evidence of its contents is admissible if the originals have been lost or destroyed, unless the proponent lost or destroyed them in bad faith. "The essential principle of preferred evidence is that it is to be procured and offered *if it can be had....* The thought is here not that a certain kind of evidence is absolutely necessary, but that a certain kind is to be used if it is available." 4 J. Wigmore, *Evidence* § 1192 (Chadbourn Rev.1972) (emphasis in original). Therefore, when the proponent cannot produce the original of a written document, because of its loss or destruction, the trial court should admit secondary evidence.

■ CRE 1004(1) requires exclusion of evidence only when the proponent's bad faith causes the loss or destruction of the original document. The proponent must prove, to the satisfaction of the court, the absence of bad faith. 5 *Weinstein's Evidence* 1004(1)[02] (1994).

We see no reason why this same rationale should not apply to evidence other than written documents. *See Puritan Insurance Co. v. Superior Court,* 171 Cal.App.3d 877, 217 Cal.Rptr. 602 (1985) (photographs showing

real evidence that had been inadvertently lost by expert should not be excluded since loss was not intentional or in bad faith).

Here, since the trial court did not find that tenants lost or destroyed the list or slider in bad faith, the testimony and the photographs were admissible secondary evidence. Furthermore, since there was no evidence tending to show that the list or the slider would have been unfavorable to tenants, no adverse inference was appropriate and, thus, the trial court acted within its discretion.

## II. Reduction of Judgment to Reflect Pretrial Payment by Landlord's Insurer

Landlord contends the trial court erred in denying his motion to amend judgment to reflect the $5,000 payment by his insurer to husband prior to trial. We conclude that this issue is moot.

The trial court entered judgment in favor of husband for $192,500, which reflected a reduction for 30 percent contributory negligence, but did not include the $5,000 reduction for the payment husband received from landlord's insurer. However, tenants filed a post-trial motion to include interest in the judgment which further reduced husband's judgment from $192,500 to $187,500 to reflect the $5,000 payment. The trial court granted tenants' motion and calculated interest on husband's portion of the judgment based on $187,500. Hence, we conclude that this issue is moot.

## III. Calculation of Interest on Personal Injury Judgments that are Appealed

On cross-appeal, tenants challenge the operation of § 13–21–101, C.R.S. (1987 Repl. Vol. 6A), on both statutory and constitutional grounds. The trial court calculated interest on tenants' award at 9 percent. However, by operation of § 13–21–101, when a judgment debtor appeals, interest must be recalculated and compounded annually at a rate set by the secretary of state. As a result of lower interest rates in recent years, the interest rates set by the secretary of state, which are applicable to tenants' awards here, are lower than 9 percent per annum.

## A. Statutory Challenge

Tenants first contend that, in order to fulfill the legislative intent of discouraging judgment debtors from appealing solely for economic benefit, § 13–21–101 should be interpreted to provide a minimum annual interest rate of 9 percent on personal injury judgments. We disagree.

Section 13–21–101 requires that interest on a personal injury judgment be calculated at an annual interest rate of 9 percent. In 1982, the General Assembly amended the statute to require a different interest rate to be applied to a personal injury judgment when the judgment debtor appeals and the judgment is affirmed. Hearings on S.B. 140, before the Senate Judiciary Committee, 53rd General Assembly, First Session (February 17, 1982). The 1982 amendment did not disturb the statutory provisions providing for annual interest of 9 percent on judgments where the judgment debtor does not appeal.

The 1982 amendment required interest on personal injury judgments where the judgment debtor appeals and the judgment is affirmed to be recalculated at an annual interest rate as established by the secretary of state. The secretary of state is required to establish the annual interest rate for those judgments at 2 percent above the prevailing market rate, each year on January 1st.

From 1989 to 1991, the secretary of state had established the interest rate at 9 percent per annum. However, as a result of declining interest rates, the secretary of state established a lower rate for 1992 and 1993. The 1982 amendment requires interest on personal injury judgments that are appealed, and affirmed on appeal, to be recalculated to include interest compounded annually at the rate set by the secretary of state. As a result of the recent decline in interest rates below 9 percent, the tenants assert that they will lose more than $25,000 because of landlord's appeal.

Another division of this court has held that § 13–21–101, as amended, is clear and unambiguous in its requirement that personal injury judgment interest is to be recalculated at the variable interest rate set by the secretary of state in the event of an appeal. *Ackerman*

*v. Power Equipment Co.*, 881 P.2d 451 (Colo. App.1994). We find this case to be dispositive. Therefore, we reject tenants' contentions.

## B. Constitutional Challenge

Tenants contend, alternatively, that if § 13–21–101 is interpreted to allow an annual interest rate to be set below 9 percent, the statute would result in an unconstitutional denial of equal protection of the law for judgment creditors when their judgment debtor appeals. We are not persuaded.

 Equal protection of the laws assures that people who are similarly situated receive like treatment. *Gallegos v. Phipps*, 779 P.2d 856 (Colo.1989). When the classification does not involve a fundamental right, suspect class, or classification based on gender, the court must use a rational basis test to determine whether the statute violates the person's right to equal protection of the laws. *Charlton v. Kimata*, 815 P.2d 946 (Colo. 1991).

 The right to recover damages in tort is not a fundamental right. *Austin v. Litvak*, 682 P.2d 41 (Colo.1984). Also, in *Austin,* the Supreme Court declined to apply the intermediate standard of review to an equal protection challenge in which the plaintiff was seeking to recover damages in tort. Rather, the appropriate standard of review is the rational basis test, *see Sigman v. Seafood Limited Partnership I,* 817 P.2d 527 (Colo. 1991), since prejudgment interest is considered to be an item of damages. *See Heid v. Destefano,* 41 Colo.App. 436, 586 P.2d 246 (1978).

 The rational basis test requires a court to determine, first, whether the classification has some rational basis in fact and, second, whether it is rationally related to a legitimate interest. *Charlton v. Kimata, supra.*

 A statute is not rendered unconstitutional simply because the distinctions created are not made with "mathematical nicety" or because it will result "in some inequality." Rather, the problems of government are practical ones and often justify, if not re-

quire, "a rough accommodation of variant interests." *Dawson v. Public Employees Retirement Ass'n,* 664 P.2d 702, 708 (Colo.1983).

 Here, tenants argue that, inasmuch as the prevailing low market interest rates will cause judgment creditors whose debtors have not appealed to receive interest calculated at 9 percent per annum, while judgment creditors whose debtors appeal will receive a lower interest rate, the latter group is denied equal protection of the law. While we concede this result may occur, we perceive no constitutional defect in the statute.

The General Assembly enacted § 13–21–101 with the intent of tying the interest rate to be paid on a judgment to the prevailing market rate when a personal injury judgment is appealed. The purpose of the statute was to discourage appeals by judgment debtors when the prevailing market rate was high relative to the statutory interest rate on judgments because the General Assembly perceived abusive practices in which a judgment debtor would appeal simply to retain the money longer and thereby benefit from the higher market interest rates. It determined that requiring the secretary of state to establish a statutory interest rate tied to the prevailing market rate was more equitable to both judgment creditors and debtors because the interest rate would reflect the return they could have received on their money if they would have been able to invest it during that time. *See* Hearings on S.B. 140, before the House Judiciary Committee, 53rd General Assembly, First Session (March 2, 1982).

The General Assembly considered that, if interest rates fell, the statute would cause appealed judgments to carry a lower interest rate than non-appealed judgments. Hearings on S.B. 140, *supra.* However, it passed the 1982 amendment anyway.

Section 13–21–101 is not unconstitutional merely because some inequality may arise between judgment creditors whose debtors have appealed and those whose debtors have not appealed. Since the statute creates a class of judgment creditors whose debtors appeal and establishes an interest rate for those judgments which is tied to the prevailing market rate, it has a rational basis in

fact. Also, under current market conditions, only judgment debtors who neither appeal nor pay a judgment promptly are penalized under the statute. Thus, the statute is rationally related to the legitimate interest of encouraging judgment debtors promptly to appeal or pay the judgment against them.

Further, we note that, under C.A.R. 38(d) and § 13–17–102, C.R.S. (1987 Repl.Vol. 6A), sanctions, costs, and attorney fees may be imposed against a judgment debtor who files a frivolous appeal solely to gain a more favorable interest rate. Hence, an appellate court could award as a sanction under C.A.R. 38(d), upon request of the judgment creditor in the event of a frivolous appeal, an amount equal to the difference between post-judgment interest calculated at 9 percent and such interest calculated at the lower, variable rate under § 13–21–101. *See In re Marriage of Mann*, 655 P.2d 814 (Colo.1982). Consequently, we conclude that tenants' right to equal protection is not violated by operation of this statute.

The judgment is affirmed; however, the cause is remanded for the recalculation of interest on the awards in accordance with § 13–21–101, C.R.S. (1987 Repl.Vol. 6A).

RULAND, J., concurs.

BRIGGS, J., specially concurs.

Judge BRIGGS specially concurring.

I concur in affirming the judgment in favor of plaintiffs and in remanding for recalculation of interest. I write separately to emphasize the reasons why, in my view, the solution to perceived inequities in calculating interest under § 13–21–101, C.R.S. (1987 Repl.Vol. 6A) lies with the General Assembly.

I.

The General Assembly amended § 13–21–101 in 1982 because the statutory rate of interest a judgment debtor had to pay was lower than the interest that could be earned by withholding payment and investing the money during the appeal. The remedy provided is a variable rate of interest "roughly equivalent" to the rate of return on the open market. *See* Hearings on S.B. 140 before the Senate Judiciary Committee, 53rd General Assembly, First Session (February 17, 1982) and Hearings before the House Committee On Judiciary, 53rd General Assembly, First Session (March 2, 1982).

Plaintiffs assert that, while the General Assembly has accomplished its purpose of discouraging judgment debtors from filing appeals without merit when interest rates are high, it has unintentionally encouraged them to file appeals regardless of merit when rates are low in order to obtain the lower variable rate. They point out that, as a result of this appeal, they are deprived of some $25,000 in interest to which they would be entitled if defendant had not appealed.

Plaintiffs therefore argue we must construe § 13–21–101 to provide that the fixed rate of interest that applies when a judgment debtor in a personal injury lawsuit does not appeal establishes the minimum rate of interest that applies when a judgment debtor appeals. In my view, this reflects a misapprehension of our role in construing a statute.

II.

In construing statutes, courts do not in every case resort to legislative history. As recognized in *Ackerman v. Power Equipment Co.*, 881 P.2d 451 (Colo.App.1994), when a statute is plain and unambiguous on its face, as it is in this case, resort to legislative history to determine intent is not only unnecessary, but inappropriate. In other words, we use legislative history to clarify, not create, ambiguity. *See* H. Hart & A. Sacks, *The Legal Process: Basic Problems in the Making and Application of Law* (W. Eskridge & Frickey eds., 1994).

This venerable principle of statutory construction derives from the role played by the courts in our system of government. It is true that, in acting as an independent but complementary branch of government, the courts supplement the legislative process by filling the gaps left by the legislative branch in making law. *See* A. Tate, Jr., *The Law–Making Function Of The Judge*, 28 La. L.Rev. 211 (1968); B. Cardozo, *The Nature*

*Of The Judicial Process* (1921). However, courts are not free to make their own laws.

If we are to claim the authority to construe statutes on a basis independent of the democratic process, then we must accept the responsibility to act only on a principled basis. *See People v. Barry,* 888 P.2d 327 (Colo.App. 1994) (Briggs, J., dissenting). It is therefore often said we must seek out the "intent" of the General Assembly. However, this statement can be misleading. We, of course, cannot determine the subjective intent of each legislator involved in the process. *See* 2A N. Singer, *Sutherland Statutory Construction* § 45.06 (5th ed. 1993).

It may be more accurate to say that we must determine the legislative "aim," or purpose, as evinced in the language of the statute and, if necessary, in light of other external manifestations of that legislative purpose. *See* F. Frankfurter, *Some Reflections on the Readings of Statutes,* 47 Colum.L.Rev. 527 (1947). And, upon determining that purpose, our role in making law is still limited: We do not fill any perceived gaps in the legislative remedy by crafting additional remedies we consider appropriate; we can only add force and life to the remedy provided. *See* H. Hart & A. Sacks, *The Legal Process, supra.*

We can construe a statute to avoid an absurd result. *See People v. Bowman,* 812 P.2d 725 (Colo.App.1991). However, in doing so we cannot ignore the intent, or purpose, of the General Assembly. Rather, we are to presume that the General Assembly intended a just and reasonable result. Section 2–4–201(1)(c), C.R.S. (1980 Repl.Vol. 1B). We therefore must seek to determine what just and reasonable result the General Assembly intended and allow such an intention to prevail. *See People v. Bowman, supra.*

Our role in this process is one that requires restraint. We must recognize that our function in construing statutes, though a form of making law, is to act merely as interpreters of a remedy created by a branch of government consisting of members duly elected through the democratic process. *See generally,* F. Frankfurter, *Some Reflections on the Readings of Statutes, supra.*

III.

A division of this court in *Ackerman v. Power Equipment Co., supra,* articulated the legislative purpose of the 1982 amendment to § 13–21–101 to be the elimination of economic incentive for judgment debtors to appeal. It could also be inferred that the purpose was to ensure that judgment debtors could not use appeals as a mechanism to deprive judgment creditors of a fair rate of return. It cannot be said that the amendment fails to achieve this purpose. In any appeal a judgment creditor will receive the variable rate of interest, intended by the General Assembly to be "roughly equivalent" to the rate of return on the open market.

Plaintiffs argue the effect of the amendment is to discriminate unfairly against judgment creditors whose judgments are not appealed. However, all judgment creditors face the same risk of receiving interest on a judgment at a rate no greater than the rate of return on the open market.

Thus, although the remedy may be imperfect, the only "absurd" result is to encourage the use of appeals by judgment debtors to limit interest on judgments to a fair rate of return. This "absurdity" may negatively impact congested appellate courts, but it is not unjust to judgment creditors.

Moreover, the only alternative construction urged by plaintiffs—establishing the fixed rate expressly provided when a judgment debtor does not appeal as the minimum rate when a judgment debtor does appeal—is contrary to the plain wording of the statute. To so construe the statute, we would not be filling a gap resulting from ambiguity in its language. We would be stepping into the role of the General Assembly to supply a new and different remedy. However just that step may appear, it is not one that this court should take.