The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
July 9, 2020

## 2020COA103

## No. 18CA2358, *Warembourg v. Excel Elec., Inc.* — Evidence — Spoliation — Sanctions — Adverse Inference Instruction

A division of the court of appeals analyzes whether a trial court abused its discretion in giving an adverse inference jury instruction containing an irrebuttable presumption of causation and liability as a sanction after finding that the defendant engaged in spoliation by destroying a critical piece of evidence, in breach of its duty to preserve that evidence. The division holds that Colorado law authorizes the imposition of such an instruction for the pre-litigation destruction of evidence and that the trial court did not abuse its discretion in imposing the instruction as a sanction for spoliation.

The division additionally holds that the trial court did not err in classifying the plaintiff as an invitee under the Premises Liability

Act, § 13-21-115, C.R.S. 2019; in its evidentiary rulings; in declining to instruct the jury on the plaintiff's alleged assumption of risk; and in ruling that the cap on noneconomic damages in the Construction Defect Action Reform Act, § 13-20-806(4)(a), C.R.S. 2019, does not limit the plaintiff's damages.

Court of Appeals No. 18CA2358
Boulder County District Court No. 17CV30891
Honorable Nancy W. Salomone, Judge

Brian Warembourg,

Plaintiff-Appellee,

v.

Excel Electric, Inc.,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE LIPINSKY
Freyre and Graham*, JJ., concur

Announced July 9, 2020

Zaner Harden Law, LLP, Kurt Zaner, Sara McEahern, Denver, Colorado; Levin Sitcoff, PC, Nelson A. Waneka, Denver, Colorado, for Plaintiff-Appellee

Walberg Law, PLLC, Wendelyn K. Walberg, Morrison, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2019.

¶ 1     Spoliation — a party's failure to preserve evidence — jeopardizes adverse parties' ability to obtain justice. The truth-seeking function of our legal system is thwarted if a party is deprived of material evidence during discovery or if the finder of fact is denied that evidence at trial. Thus, upon learning that he or she is likely to be involved in litigation, a person has a legal duty to preserve all potentially relevant evidence within his or her possession.

¶ 2     Courts possess the inherent authority to impose sanctions for spoliation. Judges have the power to enter a broad range of penalties against spoliators, depending on whether the destruction of the evidence was intentional, the prejudice to the other party, how spoliation affects the judicial process, and whether lesser sanctions would be effective. These penalties can range from monetary sanctions to the most drastic sanction of all — the entry of a default judgment. Adverse inference jury instructions fall in the middle of the spectrum of sanctions.

¶ 3     In this case, we consider whether a trial court abused its discretion in giving an adverse inference jury instruction containing an irrebuttable presumption of causation and liability (the subject

1

instruction) as a sanction after finding that the defendant destroyed a critical piece of evidence, in breach of its duty to preserve that evidence.

¶ 4 Because we discern no abuse of discretion, and disagree with the defendant's other arguments, we affirm.

## I. Background Facts and Procedural History

### A. Warembourg's Injury

¶ 5 Brian Warembourg, an employee of Schmidt Custom Floors, Inc., provided flooring for a new home being constructed by Feller Homes, Inc. Excel Electric, Inc., performed the electrical work at the construction site. It installed a temporary electrical box (the box) to supply power to the subcontractors.

¶ 6 While working at the site on September 9, 2015, Warembourg was unable to power his equipment using the home's interior outlets. He plugged a tool into the box, which was located outside the home, but discovered that the exterior outlets on the box also were not working. To troubleshoot the problem, he removed the box's front cover and began toggling the circuit breakers inside the box. While toggling one of the breakers, the box "exploded," shooting an "intense release" of electricity into Warembourg's hand.

Warembourg suffered permanent and disabling injuries as a result of the electrocution.

¶ 7     Warembourg's coworker photographed the damaged box shortly after the accident.  The pictures depict a weathered electrical box lacking legible warning stickers.  Although the box's cover had been removed, the photographs show that none of the box's internal wiring had been disconnected.

B.     Excel's Pretrial Conduct and the Spoliation Sanction

¶ 8     On the day of the incident, Excel learned that someone had been injured at the job site.  Excel retrieved the damaged box and took it to its warehouse.  The next morning, Shane and Corey Heil, Excel's owners, inspected the box. (For clarity, and without intending any disrespect, we refer to the members of the Heil family by their first names.)  Neither Shane nor Corey wrote any notes about or photographed the box.  Excel discarded the box sometime during the next eight months.

¶ 9     An investigator for Warembourg's worker's compensation carrier, Pinnacol Assurance, called Shane on October 27, 2015, "in regards to an injury that one of [its] . . . injured workers had . . . ."  The investigator explained, "There was a temporary power pole that

3

was set up. And we're just trying to figure out if there w[ere] any circumstances that contributed to his injury." Shane told the investigator that his "shop guy" "probably" threw the box away because it was unrepairable. Shane later added, "And when I heard [Warembourg] got hurt, it's like, he probably shouldn't have been in [the box] in the first place."

¶ 10    On April 29, 2016, Warembourg's counsel sent Excel a letter introducing himself, referencing his client's injury claim, and putting Excel on notice of its duty to preserve evidence. The letter specifically mentioned the need to preserve "the temporary electrical box" and other "evidence relating to this incident."

¶ 11    Excel tendered a claim to its liability insurance carrier on May 13, 2016. Shane sent the insurance carrier a letter discussing the cause of Warembourg's injuries. In the letter, Shane speculated that Warembourg had been using a power cord lacking an industry standard end and attempted to overcome his lack of proper equipment by hooking the deficient cord directly to a breaker in the box. Shane claimed that Warembourg removed the cover to the box, reached into the electrified box, and unhooked live wires.

4

¶ 12    Warembourg filed suit against Excel.  In its answer, Excel pleaded contributory negligence and assumption of risk as affirmative defenses, and designated Schmidt Floors as a nonparty at fault.  It "admit[ted] that approximately six months after the [box] . . . was returned, the [box] was thrown away."

¶ 13    In interrogatory responses, Excel claimed that "[t]he exact date the box was disposed of is not known, but it was approximately six months after the date of the incident when [Excel's] storage unit underwent its customary six month cleanout.  Shane Heil would have been the individual responsible for authorizing the disposal of the box."  Excel added, "[a]fter the date of the incident, Excel did not hear anything about the accident or about [Warembourg] until it received a phone call from an attorney over a year later."

¶ 14    Warembourg deposed several of Excel's employees, including Shane, Matthew O'Connell, Corey, and Chris Heil.  (O'Connell was a longtime employee of Excel.  Chris is Corey's son and Shane's nephew.)

¶ 15    Shane testified during his deposition that Excel retained the box for approximately six months "[b]ecause we cleaned out our warehouse sometime in May after the accident."  He reiterated, "We

5

threw it out six months after we brought it back to the shop."
When Warembourg questioned Shane's timeline, Shane said the
box was destroyed in March or April 2016. Shane admitted,
however, that he was guessing the date because Excel did not have
any records concerning the cleaning. Shane further testified that
he ordered Chris to throw away the box because it was taking up
space.

¶ 16      During his deposition on March 28, 2018, O'Connell testified
that Excel currently displayed a damaged electrical panel (the
panel) on a wall at its warehouse as a warning to Excel's employees
about the dangers of electricity. Someone had written "IGNORANT
FLOORING GUY" next to the panel. O'Connell explained that the
panel had been there for years.

¶ 17      During Corey's deposition, he stated that Excel threw away the
box between six to eight months after Warembourg's accident. He
said he was present when the box was thrown away and probably
made the decision to do so. However, Corey conceded that the last
time he remembered seeing the box was September or October
2015, and that he could not "even say that it was [in Excel's
warehouse] in December [2015] to be honest."

¶ 18    Corey further testified that Excel held the box in the "job room," which was not subject to periodic cleanings and would not have been cleaned until three months after Excel's work with Feller Homes concluded in late 2016 or early 2017.  Finally, Corey admitted that he knew Warembourg suffered a "major injury" based on the information Shane received from Pinnacol Assurance in the October 27, 2015, call.

¶ 19    Following these depositions, Warembourg served a request to inspect the panel at Excel's warehouse.  Excel objected, claiming that it destroyed the panel in late March 2018 — apparently within hours of O'Connell's revelation about the existence of the "IGNORANT FLOORING GUY" label and the panel.

¶ 20    Warembourg next deposed Chris.  Chris testified that he threw away the panel after Shane told him to remove it from the warehouse wall and Corey told him to dispose of it.  Chris also said he did not remember seeing the box.

¶ 21    Excel moved for a ruling that the Premises Liabilities Act (PLA), § 13-21-115, C.R.S. 2019, provided Warembourg's sole remedy and for a determination of Warembourg's status under the PLA.  Excel asserted that Warembourg was a trespasser because he

had lacked its permission to "break into" its box and had engaged in criminal activity under sections 18-4-506.5 or 18-2-101, C.R.S. 2019, by removing the box's cover. The court agreed that the PLA provided Warembourg's exclusive remedy, but classified Warembourg as an invitee at the time of the accident because both parties presented evidence that he had the authority to access the breakers within the box.

¶ 22    In addition, Warembourg moved for entry of a default judgment against Excel as a sanction for its destruction of the box and the panel and lack of candor regarding these items. The district court found that Excel provided inconsistent accounts of the date it destroyed the box and, consequently, found that Excel engaged in spoliation when it destroyed the box in bad faith. The court further found that Excel's spoliation prejudiced Warembourg because an exemplar panel and photographs of the box were inadequate substitutes for the box itself. The court also determined that Excel's destruction of the panel during litigation adversely impacted its credibility concerning its destruction of the box.

¶ 23    After determining that it could not impose "the ultimate sanction of default in absence of a rule or court order," the district

court announced it would give an adverse inference jury instruction as a sanction for Excel's spoliation. The court asked the parties to tender proposed language for the instruction and submit briefs on the times during the trial when the court should read the instruction to the jury.

¶ 24 At the trial management conference, the district court ruled that Excel could not present evidence that Warembourg had engaged in criminal conduct.

¶ 25 Shortly before trial, the district court conducted a hearing to determine the language of the subject instruction. Based on its previous findings that Excel destroyed the box intentionally and in bad faith, the court concluded that the appropriate sanction was an instruction that the jury must presume Excel failed to use reasonable care to protect Warembourg against the danger the box presented and, therefore, was *a* cause of the accident. The instruction stated,

> [d]ue to the Defendant's destruction of the electrical box, the Court has previously made a legal finding that the electrical box is presumed to have been a danger on the property about which [Excel] knew or, as an entity using reasonable care, should have known; that [Excel] failed to use reasonable

care to protect against the danger of the electrical box on the property, and [Excel's] failure was a cause of [Warembourg's] injuries, if any. You must regard those facts as proven.

Therefore, you need only consider whether plaintiff has proven by a preponderance of the evidence that he had injuries.

¶ 26    In addition, the court specifically barred Excel from presenting evidence that it acted with due care and announced it would read the subject instruction each time Excel defied its order by introducing evidence of its due care.

¶ 27    The court did not strike Excel's contributory negligence defense, however. For this reason, the court declined to give Warembourg's proposed instruction that the box was "*the* cause" of his injuries. (Emphasis added.) The court also rejected Warembourg's request for a standalone instruction. Finally, the court determined that evidence of the condition of the box was admissible because it was relevant to the credibility of Excel's employees and to its contributory negligence defense.

C.    The Trial and Excel's Motion to Cap Warembourg's Damages

¶ 28    The district court enforced the spoliation sanction against Excel by reading the subject instruction to the jury after Excel's

10

expert opined that Warembourg had engaged in dangerous actions when he removed the box's cover. The court also read the subject instruction to the jury during voir dire — upon Excel's request — and after the completion of the evidentiary portion of the trial. Consistent with its pretrial rulings, the court allowed Warembourg to present testimony about the panel and the likely condition of the box before the accident.

¶ 29 Further, the court rejected Excel's tendered assumption of risk instruction because the evidence showed that Warembourg lacked knowledge of the specific danger associated with toggling the breaker and, thus, did not consent to the risk of injury. The court also struck Excel's assumption of risk defense because it was inconsistent with its contributory negligence defense and designation of a nonparty at fault.

¶ 30 The jury returned a verdict in favor of Warembourg. It concluded that neither Warembourg nor Schmidt Floors acted negligently or caused Warembourg's injuries. Rather, it found Excel to be 100% at fault. The jury awarded Warembourg damages totaling approximately $16 million, of which approximately $5.3 million was for his noneconomic injuries.

¶ 31 Excel moved to cap the jury's award of noneconomic damages under the Construction Defect Action Reform Act (CDARA), §§ 13-20-801 to -808, C.R.S. 2019, arguing that CDARA's statutory cap applied to construction professionals such as itself. The district court disagreed, ruling that CDARA's cap did not limit Warembourg's damages because this was not a construction defects case. Instead, the court applied the general cap on noneconomic damages found in section 13-21-102.5(3)(a), C.R.S. 2019, which was nearly twice as high as CDARA's cap. The court then doubled the general cap due to Warembourg's "profound, severe, and life-altering" injuries. *See* § 13-21-102.5(3)(a).

¶ 32 Excel also filed a motion for new trial, which the district court denied.

## II. Discussion

¶ 33 Excel advances five primary contentions of error:

(1) The district court improperly classified Warembourg as an invitee under the PLA.

(2) The district court erred in giving the subject instruction as a sanction for Excel's spoliation.

12

(3) The district court abused its discretion by barring Excel's evidence that it had acted with due care and that Warembourg had violated the criminal code, and by allowing Warembourg to testify about the condition of the box, which Excel claimed amounted to improper advocacy by the court.

(4) The district court erred in declining to instruct the jury on Excel's assumption of risk defense.

(5) The district court should have capped Warembourg's noneconomic damages under CDARA.

### A. Warembourg's Status Under the PLA

¶ 34  Excel contends that the district court erred by ruling that Warembourg was an invitee for purposes of the PLA. Excel specifically asserts that, because he was not authorized to "break into" its box, Warembourg was a trespasser or, at best, a licensee. And, because Warembourg failed to present evidence that Excel knew of any dangers created by the box, Excel argues that he is not entitled to recover any damages. We discern no error in the court's classification of Warembourg as an invitee under the PLA, however.

13

### 1. Standard of Review

¶ 35    We review a trial court's ruling on whether a plaintiff was an invitee, licensee, or trespasser at the time of injury as a mixed question of fact and law. *Legro v. Robinson*, 2015 COA 183, ¶ 15, 369 P.3d 785, 789; *see* § 13-21-115(4). "We defer to the court's credibility determinations, and will disturb its findings of historical fact only if they are clearly erroneous and not supported by the record." *Legro*, ¶ 15, 369 P.3d at 789. But we review de novo the court's application of the facts to the governing legal standards. *Id.*

### 2. Legal Authority

¶ 36    The General Assembly enacted the PLA to "establish a comprehensive and exclusive specification of the duties landowners owe to those injured on their property." *Vigil v. Franklin*, 103 P.3d 322, 328 (Colo. 2004); *see* § 13-21-115(2) ("In any civil action brought against a landowner by a person who alleges injury occurring while on the real property of another and by reason of the condition of such property, or activities conducted or circumstances existing on such property, the landowner shall be liable only as provided in" section 13-21-115(3).) The statute "preempts prior common law theories of liability, and [is] the sole codification of

14

landowner duties in tort." *Vigil*, 103 P.3d at 328; *see Wycoff v. Grace Cmty. Church of Assemblies of God*, 251 P.3d 1260, 1265 (Colo. App. 2010) ("The [PLA] provides the sole remedy against landowners for injuries on their property.").

¶ 37     A "'landowner' includes, without limitation, an authorized agent or a person in possession of real property and a person legally responsible for the condition of real property or for the activities conducted or circumstances existing on real property." § 13-21-115(1). "Thus, a 'person need not hold title to the property to be considered a "landowner."'" *Wycoff*, 251 P.3d at 1266 (quoting *Burbach v. Canwest Invs., LLC*, 224 P.3d 437, 441 (Colo. App. 2009)).

> We read the statute as intending to define and limit the liability of property owners. Such protection is, in our view, available to authorized agents or parties in possession of the property *and also to parties legally responsible for the condition of the property or activities conducted on it.* Since the protections of the statute are broad-reaching, its responsibilities must be coextensive. Therefore, an independent contractor . . . is a "landowner" for purposes both of the protections and the responsibilities of the statute.

*Pierson v. Black Canyon Aggregates, Inc.*, 48 P.3d 1215, 1216 (Colo. 2002) (emphasis added).

¶ 38    Section 13-21-115(3) "outlines the respective duties that a landowner owes to trespassers, invitees, and licensees and provides that a breach of those duties may result in liability for damages caused." *Lombard v. Colo. Outdoor Educ. Ctr., Inc.*, 187 P.3d 565, 574 (Colo. 2008); *see Legro*, ¶ 19, 369 P.3d at 789 ("[T]he ability of an injured party to recover is correlated with his status as a trespasser, licensee, or invitee." (quoting § 13-21-115(1.5)(a))).

¶ 39    A landowner owes the greatest duty of care to an invitee, a lesser duty to a licensee, and the least duty to a trespasser. *Wycoff*, 251 P.3d at 1265; *see* § 13-21-115(3). The PLA defines invitee, licensee, and trespasser as follows:

> (a) "Invitee" means a person who enters or remains on the land of another to transact business in which the parties are mutually interested or who enters or remains on such land in response to the landowner's express or implied representation that the public is requested, expected, or intended to enter or remain.

> (b) "Licensee" means a person who enters or remains on the land of another for the licensee's own convenience or to advance his own interests, pursuant to the landowner's

permission or consent.  "Licensee" includes a social guest.

(c) "Trespasser" means a person who enters or remains on the land of another without the landowner's consent.

§ 13-21-115(5).

¶ 40    A plaintiff's status may change if he or she exceeds the scope of the landowner's invitation to access the property.  *Chapman v. Willey*, 134 P.3d 568, 569-70 (Colo. App. 2006).

### 3.    Analysis

#### a.    Warembourg's Status Under the PLA Is Not a Moot Issue

¶ 41    As an initial matter, Warembourg claims that his status under the PLA is moot because this determination concerns only the standard of care Excel owed to him, which the district court conclusively resolved through the subject instruction.  We reject this argument, however, because it assumes that the court would have imposed an identical sanction regardless of its ruling on Warembourg's status under the PLA.

¶ 42    The subject instruction specifically said that Excel "knew, or as an entity using reasonable care, should have known" that the box presented a danger of injury.  The "knew or should have known" language mirrors the standard to which landowners must

17

adhere to protect invitees under the PLA. *See* § 13-21-115(3)(c)(I). Thus, it appears the district court fashioned the sanction based on its previous ruling that, pursuant to the PLA, Warembourg was an invitee. Had the court's PLA ruling differed, the sanction likely would have differed too. Thus, because the court's PLA ruling informed its sanction, which impacted the later proceedings in the case, we conclude that Warembourg's status under the PLA is not moot.

b. Warembourg Was an Invitee at the Time of His Injury

¶ 43 Because the record shows that Warembourg and Excel were mutually interested in providing construction services for Feller Homes and supports the district court's finding that Excel did not tell Warembourg he could not toggle the box's internal breakers, we hold that Warembourg was an invitee under the PLA at the time of his injury. *See* § 13-21-115(5)(a) (An "[i]nvitee" is a person "who enters or remains on the land of another to transact business in which the parties are mutually interested.").

¶ 44 The parties do not dispute that Excel owned the box and was responsible for its condition and providing electrical access to subcontractors at the construction site. Thus, we conclude that

Excel was a property owner for purposes of the PLA because it was legally responsible for the condition of the box. *See Pierson*, 48 P.3d at 1216.

¶ 45 Nor do the parties dispute that Feller Homes hired Schmidt Floors and Excel to provide construction services for the new home and that Warembourg was Schmidt Floors' employee. Further, the record supports the district court's finding that "each party require[d] the existence of the other in order to perform a service for which it [could] be compensated: [Warembourg] require[d] electricity in order to install floors; and [Excel] need[ed] subcontractors, such as [Schmidt Floors], for whom construction site electricity is a commodity." For this reason, given that the parties were "mutually interested" in "transacting business," Warembourg was Excel's invitee under the PLA for purposes of accessing power from the box. § 13-21-115(5)(a).

¶ 46 The parties' agreement on the facts ends here, however. Excel concedes that Warembourg was initially its invitee but contends that Warembourg lost that status when he "broke into" the box. In response, Warembourg asserts that Excel's briefs addressing the PLA failed to provide any evidence that he had lacked the authority

to toggle the box's internal breakers. (Warembourg argues that our review is limited to the arguments presented in the parties' briefs on Warembourg's status under the PLA and, thus, we may not consider evidence Excel introduced at trial regarding Warembourg's authority to access the interior of the box).

¶ 47 Neither party apparently contends that the district court misapplied the law. Rather, Excel claims that the court erred in finding that Warembourg had the authority to access the interior of the box. Thus, the resolution of this issue turns on whether Warembourg had such authority: if he did, he was an invitee; if not, he was either a licensee or a trespasser. *See* § 13-21-115(5).

¶ 48 We need not resolve Warembourg's contention that Excel waived the right to present evidence regarding Warembourg's status under the PLA because, regardless of whether we consider the evidence introduced at trial, the record supports the district court's finding that Warembourg had the authority to troubleshoot power problems by removing the box's cover and toggling its internal breakers. Although Excel's employees testified that they had not given Warembourg permission to "break into" and "mess with" the box, there is no evidence that any of these employees — or anyone

20

else — told Warembourg he could not troubleshoot the malfunctioning box in the exact manner he did.

¶ 49     Indeed, the deposition and trial testimony show that Warembourg operated within the scope of his authority:

- Warembourg testified that he thought he had permission to use the box and troubleshoot the power problem, that he had toggled breakers "well over a thousand" times in his fourteen years as a subcontractor, and that nobody had ever told him he lacked such permission.

- Shane testified that Excel installed the box to provide power to subcontractors working at the construction site; subcontractors commonly troubleshoot power problems by removing the panel on temporary boxes to toggle the internal breakers; and Excel did nothing to stop other subcontractors from troubleshooting in this manner.

- O'Connell testified similarly, explaining that subcontractors have access to temporary boxes, commonly remove the boxes' covers to troubleshoot problems, and have not been told they are not authorized to do so.

21

- Corey testified that Excel does not tell subcontractors that they may not access the interior of its temporary boxes.

- The Inspection Supervisor for the City of Westminster opined that subcontractors commonly remove the panel on boxes and toggle the internal breakers to troubleshoot power issues.

Moreover, contrary to Excel's assertions, the photographs of the damaged box in the record prove it lacked legible warning stickers. Based on this evidence, we conclude that Excel did not limit Warembourg's authority to access the box.

¶ 50    Because Warembourg possessed the authority to troubleshoot the power problem by removing the box's cover and toggling its internal breakers, the district court did not err in classifying him as an invitee under the PLA.

### B.    The Spoliation Sanction

¶ 51    Excel contends that the district court erred in instructing the jury on an irrebuttable presumption of causation and liability as a sanction for Excel's destruction of the box. We disagree.

## 1. Standard of Review

¶ 52 Because "trial courts enjoy broad discretion to impose sanctions for spoliation of evidence, even if the evidence was not subject to a discovery order permitting sanctions under C.R.C.P. 37[,] . . . we will not overturn the trial court's determination unless it is manifestly arbitrary, unreasonable, or unfair." *Castillo v. Chief Alt., LLC*, 140 P.3d 234, 236 (Colo. App. 2006); *see Pfantz v. Kmart Corp.*, 85 P.3d 564, 567 (Colo. App. 2003). If a court imposes an adverse inference instruction as a sanction for spoliation, "the form and style of the instruction [are] within the trial court's discretion." *Rogers v. Westerman Farm Co.*, 29 P.3d 887, 909 (Colo. 2001).

## 2. Legal Authority

¶ 53 "The ability to provide the jury with an adverse inference instruction as a sanction for spoliation of evidence derives from the trial court's inherent powers." *Aloi v. Union Pac. R.R. Corp.*, 129 P.3d 999, 1002 (Colo. 2006) (citing *Pena v. Dist. Court*, 681 P.2d 953, 956 (Colo. 1984)). Although courts' inherent powers to sanction spoliation may differ between jurisdictions, *see Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001), "we are persuaded by Colorado cases involving discovery violations, as well

as by more recent federal precedent," for guidance on whether a court abuses its discretion by imposing a particular sanction, *Pfantz*, 85 P.3d at 568.

¶ 54    "In determining whether the trial court abused its discretion, we must examine whether the rationales underlying the adverse inference supported giving the instruction as a sanction for spoliation." *Aloi*, 129 P.3d at 1002.

> [A]dverse inference instructions serve both a punitive and a remedial purpose. The punitive function serves to deter parties from destroying evidence in order to prevent its introduction at trial. The remedial function serves to restore the putative prejudiced party to the position it would have held had there been no spoliation.

*Id.* (citations omitted).

¶ 55    To effectuate these purposes, the supreme court adopted the Fourth Circuit's rationale that a court need not find bad faith or that the content of the destroyed evidence would have been unfavorable to the spoliator before imposing a sanction in the form of an adverse instruction. *See id.* at 1003-04 ("To draw an adverse inference from the absence, loss[,] or destruction of evidence, it would have to appear that the evidence would have been relevant to

an issue at trial and otherwise would naturally have been introduced into evidence." (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995))).

¶ 56     Thus, "[t]he trial court need not find that the evidence was destroyed in bad faith; it may sanction a party who willfully destroys evidence relevant to a contested issue" if "the party knew or should have known that the destroyed evidence was relevant to pending, imminent, or reasonably foreseeable litigation." *Castillo,* 140 P.3d at 236 (citing *Aloi,* 129 P.3d at 1003); *Pfantz,* 85 P.3d at 568-69; *Rodriguez v. Schutt,* 896 P.2d 881, 884-85 (Colo. App. 1994)*, aff'd in part and rev'd in part on other grounds*, 914 P.2d 921 (Colo. 1996).

¶ 57     Further, the spoliator's state of mind is an important consideration when determining the appropriate severity of the adverse inference sanction. *See Pfantz,* 85 P.3d at 568 ("The sanction should be 'commensurate with the seriousness of the disobedient party's conduct.'" (quoting *Newell v. Engel,* 899 P.2d 273, 276 (Colo. App. 1994))).

> [A]n adverse inference instruction can take
> many forms, again ranging in degrees of
> harshness.  The harshness of the instruction

should be determined based on the nature of the spoliating party's conduct — the more egregious the conduct, the more harsh the instruction. In its most harsh form, when a spoliating party has acted willfully or in bad faith, a jury can be instructed that certain facts are deemed admitted and must be accepted as true. At the next level, when a spoliating party has acted willfully or recklessly, a court may impose a mandatory presumption. Even a mandatory *presumption*, however, is considered to be rebuttable. The least harsh instruction *permits* (but does not require) a jury to *presume* that the lost evidence is both relevant and favorable to the innocent party.

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs.*, 685 F. Supp. 2d 456, 470 (S.D.N.Y. 2010) (footnotes omitted), *abrogated on other grounds by Chin v. Port Auth.*, 685 F.3d 135 (2d Cir. 2012).

3. The District Court Did Not Abuse Its Discretion in Imposing the Subject Instruction as a Sanction for Excel's Spoliation

¶ 58    As explained above, the district court imposed the subject instruction as a sanction for Excel's intentional destruction of the box in bad faith. The court noted that this sanction served the punitive purpose of deterring misconduct and the remedial purpose of reducing the "profound[] prejudice" to Warembourg.

26

¶ 59    Excel concedes that it discarded the box and that the box would have be relevant to the litigation.  However, Excel claims that its actions were benign: its employees were not "litigation-savvy" and did not understand the importance of retaining a damaged piece of equipment for months when Warembourg had not divulged the extent of his injuries or the significance of the box to those injuries.  It further asserts that its employees' inconsistent and contradictory statements concerning the box's destruction resulted from their "possible incomplete memor[ies]" and Warembourg's engagement in "semantics."

¶ 60    In the alternative, Excel contends that, even if the record supports the court's finding, the court abused its discretion because Colorado law does not authorize the sanction it imposed.  Excel further asserts that the subject instruction impermissibly took the issues of credibility, causation, and liability away from the jury, thereby wrongfully precluding the jury from deciding the case on the merits.  We consider and reject each argument.

### a. The District Court Did Not Err in Finding that Excel Intentionally Destroyed the Box in Bad Faith

¶ 61 Excel had a legal duty to preserve the box upon learning that litigation arising from Warembourg's accident was likely. *See Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 621 (D. Colo. 2007) ("In most cases, the duty to preserve evidence is triggered by the filing of a lawsuit. However, the obligation to preserve evidence may arise even earlier if a party has notice that future litigation is likely."); *Scott v. IBM Corp.*, 196 F.R.D. 233, 249 (D.N.J. 2000) ("While a litigant is under no duty keep or retain every document in its possession, even in advance of litigation it is under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation.").

¶ 62 The analysis of when litigation was "reasonably foreseeable" is "a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011). That analysis was stymied here due to Excel's conflicting accounts of the box's destruction.

28

¶ 63　　The district court meticulously reviewed the record in determining that Excel had destroyed the box while under a duty to preserve it.  In support of its conclusion, the district court made the following findings of fact:

- "[Excel] knew within days of September 9, 2015 that [Warembourg] had sustained an injury related to the electrical box in question";

- "[Excel] was on notice as of October 27, 2015, that the box had relevance to an investigation of this injury"; and

- "[s]ometime between May 1 and 17, 2016, [Excel acquired] actual knowledge that litigation was imminent."

¶ 64　　Based on these findings, the court concluded that Excel "disposed of the electrical box sometime after it had actual knowledge that the box had potential evidentiary value . . . . Conflicting evidence and testimony provided by [Excel], however, make[] it impossible to definitely establish the date of destruction." Due to the Excel employees' conflicting testimony regarding when the box was discarded, who destroyed it, and where it was kept before its destruction, the court inferred that "at the time [Excel] destroyed the electrical box involved in [Warembourg's] injury, it

knew or should have known that the destroyed evidence was relevant to pending, imminent, or reasonably for[e]seeable litigation."

¶ 65 The record supports the district court's findings of fact and inferences from those facts. *See People in Interest of L.M.*, 2018 COA 57M, ¶ 17, 433 P.3d 114, 118 ("[T]he inferences and conclusions to be drawn from [the facts] are within the [trial] court's discretion."). First, Corey testified that Excel knew somebody had been injured "a couple days after" the accident. Corey's testimony is consistent with the evidence that an Excel employee retrieved the damaged box the day of the accident and Excel inspected the box the next day.

¶ 66 Second, following Shane's call with Pinnacol Assurance, Excel was on notice that the box was relevant to Warembourg's injuries. The investigator explained who he was, for whom he worked, and why he was calling. Their conversation focused on the condition of the box, its whereabouts, and Warembourg's alleged actions preceding the accident. Further, Shane said he knew Warembourg had been injured.

¶ 67    If there was any doubt that Excel knew the box was relevant, Shane later testified that he knew it was prudent to retain injury-causing equipment for potential worker's compensation claims. Moreover, Corey conceded that, at the time of the Pinnacol Assurance call, Excel knew that a "major injury" had occurred and that a worker's compensation carrier was investigating the cause of Warembourg's injuries and the condition of the box.

¶ 68    Third, the record evidence establishes that Excel had actual knowledge that litigation was imminent when it received the letter from Warembourg's counsel in early May 2016. The letter specifically referenced Warembourg's claim against Excel and included an express request that Excel preserve "any . . . evidence relating to this incident." Further, the record shows that Excel tendered a claim for Warembourg's injuries to its insurance carrier on May 13, 2016.

¶ 69    Thus, the record supports the district court's finding that Excel intentionally "disposed of the electrical box sometime after it had actual knowledge that the box had potential evidentiary value."

¶ 70    The record also supports the district court's inference that Excel destroyed the box in bad faith. Excel inconsistently described

31

*when* it disposed of the box. Shane first told the investigator for Pinnacol Assurance on October 27, 2015, that Excel had "probably" already thrown away the box. He initially testified in his deposition that Excel retained the box for approximately six months, but later testified that Excel kept the box until March or April 2016. Shane also testified that Excel discarded the box during a routine cleaning of its warehouse, which occurred sometime in May 2016. Yet Excel represented in interrogatory responses that it disposed of the box approximately six months after Warembourg's accident. And Corey testified that Excel retained the box for six to eight months after the accident.

¶ 71    As the district court correctly noted, "[a]t least one of these statements [wa]s necessarily false . . . [and] prevented an interested party from inspecting the box for physical evidence regarding the circumstances of [Warembourg's] injury."

¶ 72    Excel also inconsistently described *who* destroyed the box. During the call with Pinnacol Assurance, Shane stated that his "shop guy" discarded the box. Shane later testified that he was responsible for discarding the box and that either he or Chris did so. However, Chris testified that he did not remember seeing the

box.  Meanwhile, Corey testified that he was present when the box was thrown away and probably made the decision to do so. Further, in interrogatory responses, Excel certified that "Shane Heil would have been the individual responsible for authorizing the disposal of the box."  Thus, at least one of Excel's sworn statements concerning who destroyed the box must also have been false.

¶ 73    Finally, Excel inconsistently described *where* it kept the box after Warembourg's injury.  Shane initially told Pinnacol Assurance that Excel did not have the box and later testified that he directed its destruction during a routine cleaning.  Corey gave a different account, however, testifying that Excel held the box in the "job room," which was not subject to periodic cleanings.

¶ 74    The district court found that Excel intentionally destroyed the box in bad faith in anticipation of litigation, based on Excel's numerous inconsistent statements, its destruction of the "IGNORANT FLOORING GUY" label and the panel within hours following O'Connell's deposition testimony about this potentially damaging evidence, and its demonstrably false representations throughout the litigation, including its statement that "[a]fter the date of the incident, Excel did not hear anything about the accident

33

or about [Warembourg] until it received a phone call from an attorney over a year later."

¶ 75    We cannot assume the district court's role to find facts and determine credibility.  *Legro*, ¶ 15, 369 P.3d at 789 ("We defer to the court's credibility determinations, and will disturb its findings of historical fact only if they are clearly erroneous and not supported by the record.").  The district court was free to believe or disbelieve the witnesses.  We conclude that it did not err in disbelieving Excel's representations and finding that Excel intentionally destroyed the box in bad faith.

    b.    The District Court Did Not Abuse Its Discretion in Giving the Subject Instruction

¶ 76    As an initial matter, we reject Excel's assertion that Colorado law does not authorize a court to give an adverse inference jury instruction containing an irrebuttable presumption as a sanction for a party's pre-litigation destruction of evidence.  Excel provides no authority, and we can find none, that circumscribes a court's power in this manner.  To the contrary, Colorado and federal case law overwhelmingly indicates that courts possess broad discretion in fashioning the appropriate sanction for spoliation.  *See Aloi*, 129

P.3d at 1002; *see also Vodusek*, 71 F.3d at 156; *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 102 (D. Colo. 1996) (Because the imposition of sanctions is essentially a judgment call, courts' rulings "cannot be tied down to a fixed rule or formula. If such were the case, courts would lose their flexibility in the sanctions process, and discretion would lose its meaning.").

¶ 77     A court has the option to fashion an adverse inference jury instruction against the spoliator. *See Rodriguez,* 896 P.2d at 884 ("Where a party intentionally destroys evidence to prevent its introduction at trial, the trial court clearly has the power to employ an adverse inference as a sanction."); *see also Pension Comm.*, 685 F. Supp. 2d at 470. The adverse inference instruction can take different forms; "[i]n its most harsh form, when a spoliating party has acted willfully or in bad faith, a jury can be instructed that certain facts are deemed admitted and must be accepted as true." *Pension Comm.*, 685 F. Supp. 2d at 470; *see Pfantz*, 85 P.3d at 568-69 (affirming the trial court's rulings, including its decision to give an adverse inference jury instruction containing an irrebuttable presumption as a sanction for spoliation).

¶ 78    For these reasons, we hold that Colorado trial courts have the

authority to give an adverse inference jury instruction containing an

irrebuttable presumption as a sanction for a party's pre-litigation

spoliation of evidence.  *See Lauren Corp. v. Century Geophysical*

*Corp.*, 953 P.2d 200, 204 (Colo. App. 1998) ("We note that the

opposite result — denying the court the inherent power to award

sanctions . . . — would only encourage unscrupulous parties to

destroy damaging evidence before a court order has been issued.").

¶ 79    We decline to address Warembourg's contention that the

district court also had the authority to enter a default judgment as

a sanction for Excel's pre-litigation spoliation.  Such a

determination "would have no practical legal effect upon the

existing controversy" — whether the district court abused its

discretion in imposing a jury instruction containing an irrebuttable

presumption.  *Am. Drug Store, Inc. v. City & Cty. of Denver*, 831 P.2d

465, 469 (Colo. 1992) (quoting *Van Schaack Holdings, Ltd. v.*

*Fulenwider*, 798 P.2d 424, 426-27 (Colo. 1990)).

¶ 80    Having concluded that the spoliation sanction was within the

district court's authority, we now turn to whether the court abused

its discretion in imposing it.  We hold that the court did not abuse

its discretion because the sanction served the punitive function of deterring Excel's bad faith misconduct and the remedial function of restoring Warembourg to the position in which he would have been had Excel not discarded the box. *See Aloi*, 129 P.3d at 1002.

¶ 81    The court's finding that Excel intentionally destroyed the box in bad faith alone provides a sufficient punitive purpose for imposition of the subject instruction. *See Pension Comm.*, 685 F. Supp. 2d at 470; *Pfantz*, 85 P.3d at 568-69. Moreover, the district court's findings regarding Excel's destruction of the panel during litigation underscore the appropriateness of the sanction. The court needed to "deter [Excel] from destroying evidence" that would naturally have been "introduc[ed] at trial." *Aloi*, 129 P.3d at 1002.

¶ 82    The subject instruction also properly served as a remedial measure to limit prejudice to Warembourg. *See id.* The district court found that the box was "the key item of physical evidence," that it "would have been relevant to an issue at trial and otherwise would naturally have been introduced into evidence," and that Warembourg was "profoundly prejudiced" by its destruction. *Id.* at 1004 (quoting *Vodusek*, 71 F.3d at 156). The court noted that an

exemplar panel and photographs of the box were inadequate substitutes for the box itself because the "proffered substitutes cannot resolve the disputed question of the condition of [the box], and all its constituent parts, when [Warembourg] came upon it."

¶ 83 The record supports the district court's finding of prejudice and need for remedial measures. Excel destroyed the box without recording any notes or taking any photographs of it, thereby precluding Warembourg and Pinnacol Assurance from examining it. Excel subsequently misrepresented the condition of the box, stating that it found no issues during its inspection, and speculated that Warembourg's attempt to compensate for his own lack of proper equipment caused his injuries. However, Excel failed to introduce any evidence supporting its contention that Warembourg either lacked the proper equipment or injured himself while trying to hook an improper cord to the breaker. Thus, without access to the box, Warembourg could not defend himself against Excel's accusations that he, and not the box, caused his injuries. For this reason, we conclude that a lesser sanction would not have adequately remedied the prejudice to Warembourg. An adverse inference jury instruction articulating a rebuttable presumption of causation and

38

liability, for which Excel advocates, would have carried little weight given that Excel had the opportunity to examine the box and Warembourg did not. Under this hypothetical scenario, Warembourg would have had no way to refute Excel's statements that the box was functioning properly and did not cause the accident.

¶ 84　Because the district court had the authority to impose the subject instruction as a sanction for Excel's spoliation of the box, and because the sanction served punitive and remedial functions, we hold that the court did not abuse its discretion in giving the adverse inference jury instruction.

### c. The District Court Did Not Preclude the Jury from Deciding the Case on the Merits

¶ 85　Finally, we reject Excel's contention that the sanction impermissibly precluded the jury from deciding the case on the merits. As we perceive it, Excel has recloaked its previous abuse of discretion argument in the guise of a right to a jury trial argument. But Excel's contention misses the mark because courts are empowered to enforce their lawful rulings. *See Pena,* 681 P.2d at 956 ("The inherent powers which courts possess consist of: '[A]ll

powers reasonably required to enable a court to perform efficiently its judicial functions, to protect its dignity, independence, and integrity, and *to make its lawful actions effective.*'" (quoting Jim R. Carrigan, *Inherent Powers and Finance*, Trial, Nov.-Dec. 1971, at 22)) (emphasis added).  Thus, because we held above that the court did not abuse its discretion in imposing an adverse inference jury instruction containing an irrebuttable presumption, we conclude that its enforcement of the sanction did not *impermissibly* take the factfinding role from the jury.  Indeed, the federal and Colorado courts have affirmed trial courts' instructions that certain facts are deemed admitted and must be accepted as true.  *See Smith v. Kmart Corp.*, 177 F.3d 19, 28-29 (1st Cir. 1999); *Pfantz*, 85 P.3d at 567.

¶ 86      Moreover, the district court allowed Excel to present its contributory negligence defense and nonparty at fault argument. These arguments required the jury, and not the court, to determine whether Warembourg or Schmidt Floors were partly at fault for the accident.  Thus, we disagree that the subject instruction precluded the jury from deciding the case on the merits.

## C.   The District Court's Evidentiary Rulings

¶ 87   Excel argues that the district court abused its discretion by barring Excel's experts from testifying about, and Excel's counsel from discussing, the cause of Warembourg's injuries; by allowing Warembourg's allegedly speculative testimony about the condition of the box; and by precluding Excel from introducing evidence that Warembourg violated the criminal code when he accessed the box. Excel claims that the court's evidentiary rulings, in conjunction with the subject instruction, sanctioned Excel multiple times for the same act, which amounted to improper advocacy by the court. We disagree.

### 1.   Standard of Review

¶ 88   We review a trial court's evidentiary rulings for an abuse of discretion. *Wal-Mart Stores, Inc. v. Crossgrove*, 2012 CO 31, ¶ 7, 276 P.3d 562, 564. "A trial court has considerable discretion in ruling upon the admissibility of evidence, and we will find an abuse of discretion only if its ruling is manifestly arbitrary, unreasonable, or unfair." *Leaf v. Beihoffer*, 2014 COA 117, ¶ 9, 338 P.3d 1136, 1138 (quoting *Wark v. McClellan*, 68 P.3d 574, 578 (Colo. App. 2003)). "In weighing those dangers and considerations, the

41

proffered evidence 'should be given its maximal probative weight and its minimal prejudicial effect.'" *Alhilo v. Kliem*, 2016 COA 142, ¶ 9, 412 P.3d 902, 906 (quoting *Murray v. Just In Case Bus. Lighthouse, LLC*, 2016 CO 47M, ¶ 19, 374 P.3d 443, 451).

## 2. The District Court Did Not Abuse Its Discretion in Preventing Excel's Witnesses from Opining About the Safety of the Box

¶ 89 Excel specifically asserts that the district court erred by reading the subject instruction to the jury after Excel's expert opined that Warembourg had engaged in dangerous actions. Excel also contends that the court's rulings improperly precluded its witnesses from testifying that

- other contractors had safely used the box the previous year;

- "[t]he box was assembled, installed[,] and maintained according to the applicable standards of care";

- "[t]he accident's cause was not an unreasonable failure of Excel to protect against a danger of which it knew or should have known";

- "[r]easonable protection was provided by Excel against dangers which were known or should have been known"; and

- "[n]o unreasonable failure to protect caused the injury in this case."

¶ 90   We reject Excel's assertions.  The district court read the subject instruction after Excel's expert testified that, because "[Warembourg] was hurt," "the work was dangerous."  The court's action was consistent with its decision — and obligation — to enforce the subject instruction.  At the pretrial hearing, the court informed the parties,

> now that the Court has made this
> determination about the conclusive
> presumption, it is no longer relevant to assert
> or argue that [Excel] exercised due care.  The
> Court has taken that question from the jury.
> And so a circumstance where the Court might
> give this instruction would be an event that
> [Excel] argued or one of the witnesses, perhaps
> an expert, attempted to offer testimony about
> [Excel] having exercised due care.  The Court
> would give the instruction in the event that
> that was – that testimony would lead the jury
> to infer that there was due care exercised.

Given our holding that the court did not abuse its discretion in imposing the subject instruction, *supra* Part II.B.3.b, we conclude

43

that the court's reading of the instruction, just as it warned Excel it would do, was not "manifestly arbitrary, unreasonable, or unfair." *Leaf*, ¶ 9, 338 P.3d at 1138 (quoting *Wark*, 68 P.3d at 578); *see Pena*, 681 P.2d at 956 (explaining that courts have the inherent power "to make [their] lawful actions effective"); *see also Pfantz*, 85 P.3d at 568 (explaining that a party that destroys evidence in bad faith is precluded from presenting secondary evidence concerning the characteristics of the evidence (citing CRE 1004(1))).

¶ 91     Further, although the district court said that "it [wa]s no longer relevant to assert or argue that [Excel] exercised due care," the record indicates that the instruction did not preclude Excel from introducing evidence of its alleged exercise of due care regarding the condition of the box.  For example, Excel presented evidence that

- Shane inspected and tested the box before installing it at the construction site;

- the box passed inspection; and

- more than a dozen other subcontractors had used the box without reporting any issues.

44

¶ 92    For this reason, we disagree with Excel's blanket statement that the court precluded it from presenting evidence of its alleged exercise of due care.  Accordingly, we hold that the court did not abuse its discretion when it precluded Excel's expert from testifying that Excel exercised due care concerning the condition of the box.

3.    The District Court Did Not Abuse Its Discretion in Permitting Warembourg's Witnesses from Opining About the Box's Condition and Destruction

¶ 93    Excel next asserts that the district court erred in permitting Warembourg to present speculative evidence about the condition of the box, Excel's destruction of the panel, and Excel's alleged knowledge concerning its destruction of the box, which was irrelevant as a consequence of the court's imposition of the subject instruction.  The court addressed Excel's contention in denying Excel's motion for new trial, explaining that Excel's comparative fault defense and nonparty at fault argument made this evidence relevant.  The court also noted that it had permitted both parties to present evidence concerning Excel's destruction of the box, and that Excel chose to do so.

¶ 94    Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of

45

the action more probable or less probable than it would be without the evidence." CRE 401. Relevant evidence is generally admissible. CRE 402.

¶ 95 In advancing its assertion that the condition of the box was irrelevant after the court imposed the subject instruction, Excel focuses on Warembourg's PLA claim and ignores its own defenses. Evidence of the condition of the box would have been irrelevant had the subject instruction stated that Excel was *the sole cause* of Warembourg's injuries and had Excel not argued comparative fault and that Schmidt Floors was a nonparty at fault. But, by stating that Excel was "a cause" of the accident, the subject instruction left the door open for Excel's presentation of evidence that Warembourg's and Schmidt Floors' actions contributed to the accident. Thus, the condition of the box was relevant to Excel's own defenses at trial.

¶ 96 Excel's destruction of the panel and knowledge of when it destroyed the box were also relevant to Excel's theory of the case. As the district court correctly noted, the jury "had to determine [Excel's] degree of liability in comparison to [Warembourg's] and [Schmidt Floors'] alleged liability." *See* § 13-21-111(1), (2)(b), C.R.S.

2019 (providing that, in actions where the plaintiff's negligence contributed to his or her injuries, "any damages allowed shall be diminished in proportion to the amount of negligence attributable to the person for whose injury, damage, or death recovery is made," which is determined "by the degree of negligence of each party, expressed as a percentage"); § 13-21-111.5(1), C.R.S. 2019 (stating that, in applying the nonparty designation statute, "no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant . . . ."). Evidence concerning Excel's destruction of the panel during the pendency of the litigation and its knowledge of when it discarded the box were relevant to its credibility on all other issues, including its representations about the condition of the box and its percentage of fault for the accident.

¶ 97 Accordingly, we hold that the district court did not abuse its discretion in permitting Warembourg to present evidence concerning the condition of the box, Excel's destruction of the panel, and Excel's alleged knowledge when it discarded the box.

## 4. We Do Not Address Excel's Remaining Contentions of Error Concerning the District Court's Evidentiary Rulings

¶ 98 Excel contends that the district court abused its discretion by precluding Excel from introducing evidence that Warembourg allegedly violated the criminal code and by barring Excel's counsel from arguing in closing that the box was safe. But Excel devotes a mere conclusory sentence to each of these issues. We decline to address these arguments because they are "unsupported by any substantial argument" and, thus, are insufficiently developed for appellate review. *Taylor v. Taylor*, 2016 COA 100, ¶ 13, 381 P.3d 428, 431.

## 5. The District Court Did Not Improperly Act as an Advocate

¶ 99 Excel argues that the district court's evidentiary rulings improperly sanctioned Excel multiple times for the same act and, thus, amounted to improper advocacy by the court. Because we held above that the court correctly applied the subject instruction, we reject Excel's argument.

¶ 100 Moreover, despite the severity of Excel's conduct that led to Warembourg's inability to prove that the box caused his injuries, the district court went out of its way to ensure that the sanction

would not preclude the jury from deciding the case on the merits.
*See Aloi*, 129 P.3d at 1006 ("The test which must be applied here is whether the trial judge's conduct so departed from the required impartiality as to deny the [party] a fair trial." (quoting *People v. Adler*, 629 P.2d 569, 573 (Colo. 1981))). The court

- denied Warembourg's request for language in the instruction stating that the box was "the cause" of the accident;

- denied Warembourg's request for a standalone instruction highlighting Excel's spoliation;

- permitted Excel to present evidence that the "destruction [of the box] was due to a good faith accidental loss";

- never informed the jury of its finding that Excel destroyed the box in bad faith;

- permitted Excel to raise its contributory negligence defense and argue that Schmidt Floors was a nonparty at fault;

- read the adverse inference jury instruction to the jury only three times over an eight-day trial, one time at Excel's request;

- did not read the instruction in many instances where Excel presented evidence of its alleged exercise of due care concerning the condition of the box; and

- expressly invited Excel to object to Warembourg's presentation of evidence about the box if such evidence became cumulative, which Excel did not do.

Thus, we agree with the court's assessment that "the spoliation instruction was not unduly highlighted" and did not deprive Excel of a fair trial. *See Aloi,* 129 P.3d at 1006.

¶ 101 Moreover, in each of the its actions listed above, the district court addressed Excel's objections and articulated the reasoning behind its decision. *See id.* Accordingly, when we view the totality of the court's actions, we conclude that it did not act as an advocate because its actions were "motivated by a desire to remedy prejudice caused by spoliation of evidence rather than by partiality." *Id.*

D. The Rejected Assumption of Risk Instruction

¶ 102 Excel contends that the district court erred in failing to instruct the jury on Excel's assumption of risk defense, given that Warembourg presented evidence that he was qualified to troubleshoot the problems with the box; Excel introduced evidence

50

that Warembourg ignored a warning sticker on the box; and the parties agreed he voluntarily removed the box's cover and accessed the breaker. Excel further asserts that the court erroneously concluded that the tendered instruction was inconsistent with Excel's contributory negligence defense and argument that Schmidt Floors was a nonparty at fault. We discern no error.

### 1. Standard of Review

¶ 103 Trial courts must correctly instruct the jury on all matters of law. *Day v. Johnson*, 255 P.3d 1064, 1067 (Colo. 2011). We review de novo whether the "instructions as a whole accurately informed the jury of the governing law." *Id.* However, because trial courts have broad discretion to fashion the form and style of instructions, "we review a trial court's decision to give a particular jury instruction for an abuse of discretion." *Id.* "A trial court abuses its discretion only when its ruling is manifestly arbitrary, unreasonable, or unfair, or the instruction is unsupported by competent evidence in the record." *Vititoe v. Rocky Mountain Pavement Maint., Inc.*, 2015 COA 82, ¶ 78, 412 P.3d 767, 782.

### 2. Legal Authority

¶ 104 A party may plead an assumption of risk defense in PLA cases. *See Tucker v. Volunteers of Am. Colo. Branch*, 211 P.3d 708, 711 (Colo. App. 2008) ("The PLA . . . does not exclusively limit defenses and does not abrogate statutorily created defenses . . . ."), *aff'd and remanded sub nom. Volunteers of Am. Colo. Branch v. Gardenswartz*, 242 P.3d 1080 (Colo. 2010). "[A] person assumes the risk of injury or damage if he voluntarily or unreasonably exposes himself to injury or damage with knowledge or appreciation of the danger and risk involved." § 13-21-111.7, C.R.S. 2019; *see Carter v. Lovelace*, 844 P.2d 1288, 1289 (Colo. App. 1992).

### 3. The District Court Did Not Abuse Its Discretion in Declining to Instruct the Jury on Excel's Assumption of Risk Defense

¶ 105 We conclude that the district court did not abuse its discretion in rejecting Excel's tendered assumption of risk instruction because the evidence at trial showed that Warembourg lacked knowledge that toggling a breaker in the box presented a danger of injury and, thus, did not consent to that danger. *See Wark*, 68 P.3d at 581 (explaining that a court may instruct the jury on the assumption of risk defense if the facts of the case support giving the instruction).

¶ 106    Contrary to Excel's contention, the record evidence does not indicate that Warembourg knew of the danger or consented to it. Rather, Warembourg testified that he was not aware of the danger of being electrocuted by toggling the breaker. There is a difference between generally appreciating the danger of electricity and knowing that a particular electrical component presents a danger of electrocution. *See Carter*, 844 P.2d at 1290 (holding that the trial court erred in instructing the jury on assumption of the risk when the plaintiff did not assume the specific risk that caused his injuries). A finding that Warembourg's testimony was credible alone would have been sufficient for the court to reject Excel's tendered assumption of risk instruction. *See Wark*, 68 P.3d at 581 (explaining that a party's subjective knowledge of the danger is necessary for an assumption of risk instruction); *see also Legro*, ¶ 15, 369 P.3d at 789 ("We defer to the court's credibility determinations . . . .").

¶ 107    Moreover, additional evidence supported Warembourg's subjective belief that his actions were not dangerous. Shane and Corey conceded that toggling a breaker in a properly functioning box would not be a dangerous act. Warembourg's flooring expert,

his coworker, and the Inspection Supervisor for the City of Westminster confirmed this point. Further, Shane and O'Connell testified during their depositions and the Inspection Supervisor opined in his expert report that subcontractors commonly remove the panel on boxes and toggle the internal breakers to troubleshoot issues with power.

¶ 108 Excel's arguments conflate the assumption of risk and contributory negligence defenses. The distinction between these defenses reinforces our conclusion that the district court did not abuse its discretion in rejecting Excel's tendered instruction. *See Appelhans v. Kirkwood*, 148 Colo. 92, 99, 365 P.2d 233, 237 (1961) ("[A]ssumption of risk is a matter of knowledge of the danger and intelligent acquiescence in it, while contributory negligence is a matter of some fault or departure from the standard of reasonable conduct . . . ." (quoting Prosser on Torts § 305 (2d ed. 1955))); *Carter*, 844 P.2d at 1289 ("[A]ssumption of risk requires *knowledge* of the danger and *consent* to it. Contributory negligence does not."). Each of Excel's assertions rests on the subjective belief of one of *its* employees — not Warembourg's belief — that Warembourg assumed the risk of electrocution by opening the box. These

arguments potentially support the conclusion that Warembourg acted negligently, but do not support the conclusion that Warembourg assumed the risk of injury.

¶ 109   Moreover, as noted above, the photographs of the box in the record establish that it lacked legible, if any, warning stickers. We therefore reject Excel's contention that Warembourg assumed the risk of injury by ignoring the warning stickers on the box. And given our holding that the court did not abuse its discretion in rejecting Excel's tendered assumption of risk instruction because Warembourg lacked knowledge of, and did not consent to, the box's danger, we need not address the court's alternate rationale that the proposed assumption of risk instruction was inconsistent with Excel's other defenses.

E.   Caps on Noneconomic Damages

¶ 110   Excel contends that the district court erred by not applying the cap on noneconomic damages set forth in CDARA. Excel asserts that the CDARA cap applies because it "was a construction professional whom the statute was intended to protect." We disagree.

### 1. Standard of Review

¶ 111　Statutory interpretation is a question of law that we review de novo. *Colo. Oil & Gas Conservation Comm'n v. Martinez*, 2019 CO 3, ¶ 19, 433 P.3d 22, 28. "In doing so, we look to the entire statutory scheme in order to give consistent, harmonious, and sensible effect to all of its parts, and we apply words and phrases in accordance with their plain and ordinary meanings." *Id.*

### 2. Legal Authority

¶ 112　The General Assembly has proscribed a general cap on noneconomic damages:

> In any civil action other than medical malpractice actions in which damages for noneconomic loss or injury may be awarded, the total of such damages shall not exceed the sum of two hundred fifty thousand dollars, unless the court finds justification by clear and convincing evidence therefor. In no case shall the amount of noneconomic loss or injury damages exceed five hundred thousand dollars.

§ 13-21-102.5(3)(a). This cap is adjusted for inflation. § 13-21-102.5(3)(c).

¶ 113　The General Assembly has also capped noneconomic damages in construction defect cases: "In an action asserting personal injury

or bodily injury as a result of a construction defect in which damages for noneconomic loss or injury or derivative noneconomic loss or injury may be awarded, such damages shall not exceed the sum of two hundred fifty thousand dollars." § 13-20-806(4)(a), C.R.S. 2019. The CDARA cap is also adjusted for inflation. § 13-20-806(4)(b).

### 3. The General Cap on Noneconomic Damages — Not the Cap in CDARA — Applies to Warembourg's Damage Award

¶ 114 Based on the plain language of CDARA, we hold that its cap on noneconomic damages does not apply to Warembourg's judgment because this is not a construction defects case. *See* § 13-20-802.5, C.R.S. 2019. Rather, this case represents the quintessential premises liability action: Warembourg alleged that Excel was legally responsible for the condition of the property or activities conducted on it and failed to use reasonable care to protect him against a dangerous condition that caused his injury. Indeed, Warembourg could not have presented any other theory of liability after the district court ruled that the PLA provided his sole means of recovery. And this was the exact relief Excel sought in its

57

pretrial motion for a declaration that the PLA applied to Warembourg's claims.

¶ 115    Moreover, regardless of the district court's ruling on the appropriate legal theory, the facts demonstrate that CDARA does not apply. The General Assembly enacted CDARA to proscribe the rights and remedies of property owners who allege that professionals in the construction industry are responsible for construction defects on their property. § 13-20-802, C.R.S. 2019. As the district court found, Warembourg was not a property owner and his claims did not arise from a defect impacting his property.

¶ 116    Further, Excel did not intend for its injury-causing property — the box — to be an "improvement to real property." *See* § 13-20-802.5(1) (providing that CDARA applies to actions "against a construction professional . . . caused by a defect in the design or construction of an improvement to real property"). The General Assembly "intended [CDARA] to apply only to negligence in planning, design, construction, supervision, or inspection that results in a defect *in an improvement to real property* that causes an injury, and to limit actions against building professionals only for claims of injury arising from defects in the improvement they

create." *Two Denver Highlands Ltd. P'ship v. Dillingham Constr. N.A., Inc.*, 932 P.2d 827, 829 (Colo. App. 1996) (emphasis added). Given that the term "improvement to real property" is not defined in CDARA, "[t]he principal factor to be considered in making a determination of whether an activity constitutes an improvement to real property is the intention of the owner." *Id.*; *see Enright v. City of Colorado Springs*, 716 P.2d 148, 150 (Colo. App. 1985) ("[A] permanent fixture . . . must be construed as an improvement to real property."). Here, the record indicates that Excel intended to remove the box at the end of construction. Because the box was temporary, it was not an "improvement to real property."

¶ 117 Thus, CDARA's cap on noneconomic damages does not limit Warembourg's recovery. Accordingly, the general cap on noneconomic damages, which can be doubled due to Warembourg's "profound, severe, and life-altering" injuries, applies to this case. *See* § 13-21-102.5(3)(a).

### III. Conclusion

¶ 118 The district court's judgment is affirmed.

JUDGE FREYRE and JUDGE GRAHAM concur.

59